Bruce A. BAILEY, as special administrator for the estate of Joseph Roman Buenaflor, deceased, et al., Plaintiffs-Appellants,

v.

DOLPHIN INTERNATIONAL, INC., et al., Defendants-Appellees.

No. 82–2060
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Feb. 17, 1983.

Frank T. Abraham, Houston, Tex., for plaintiffs-appellants.

Ben L. Reynolds, Houston, Tex., for Union Oil Co. et al.

Jack Allbritton, Houston, Tex., for Dolphin Intern.

Stephen E. Ulrich, Houston, Tex., for Union Oil of Indonesia and Union Oil of Cal.

Before RUBIN, JOHNSON and GARWOOD, Circuit Judges.

**GARWOOD, Circuit Judge:**

This is an appeal from an order of the district court conditionally dismissing a maritime wrongful death action brought under the Jones Act, 46 U.S.C. § 688, and alternatively, under the Death on the High Seas Act, 46 U.S.C. § 761, by appellants, the survivors of a Filipino permanent resident and citizen who was drowned off the coast of Balikpapan, Indonesia, when the Bali Dolphin, a nonself-propelled jack-up drilling rig on which the decedent had been a crew member for approximately two years, capsized while being towed a short distance to another offshore drilling site. The primary question is whether American law applies to appellants' claim, and if not, whether the district court abused its discretion in dismissing the case based on the doctrine of *forum non conveniens*. We hold that, in the context of this case, American law does not govern appellants' claim, and that the district court did not abuse its discretion in conditionally dismissing the case. However, because we feel that the order of dismissal, though made subject to certain conditions, may fail to adequately protect appellants' interests, the case is reversed and remanded so that the district court may fashion a more appropriate order.

## I.

### FACTS

The Bali Dolphin was built in the United States in 1966, and was purchased and refitted by appellee Dolphin International S.A. ("Dolphin S.A.") in either 1972 or 1973. Since its acquisition by Dolphin S.A., the Bali Dolphin has worked almost exclusively in Southeast Asia. Since 1975, the Bali Dolphin and its nonself-propelled drilling tender vessel, the Green Dolphin, which are operated as a unit, have been stationed off the coast of Indonesia, drilling in the shallow water areas near Balikpapan, East Kalimanton, Indonesia.[1] Both the Bali Dolphin and the Green Dolphin are registered under the laws of Panama, and they fly the Panamanian flag.

The owner of these vessels, Dolphin S.A., is a Panamanian corporation which is wholly owned by appellee Dolphin International, Inc. ("Dolphin, Inc."), a Texas corporation. Dolphin Inc. is a wholly owned subsidiary of Quatro A/S, a Norwegian corporation whose shares are owned entirely by Norwegian citizens.[2] Both Dolphin S.A. and Dolphin, Inc. maintain their principal places of business at the same address in Houston, Texas. Dolphin, Inc. is a drilling contractor engaged in offshore drilling operations solely in the territorial waters of, and on the Continental Shelf of, the United States, primarily in the Gulf of Mexico. Dolphin S.A., also a drilling contractor, is engaged in offshore drilling operations, with the exception of the United States and its Continental Shelf, throughout the world, primarily in Spain, the North Sea, and Southeast Asia.[3]

From 1973 to 1979, Dolphin S.A.'s Southeast Asia operations were conducted out of Singapore, under the direction of area manager L.F. Anderson.[4] Also in the Singapore

---

1. The Bali Dolphin has not worked in U.S. waters since it was purchased by Dolphin S.A.

2. In 1977, at the time of Buenaflor's death, the directors of Dolphin S.A. were Fred Olsen, Bjorn Johansen, and Kristian Seim, all of whom were Norwegian residents and citizens. At present, all of the voting stock of Dolphin S.A. is owned by Quatro A/S.

3. Dolphin S.A. has never engaged in drilling operations in U.S. waters. Dolphin S.A.'s Southeast Asia operations were confined to Indonesia, Malaysia, and Singapore. The Bali Dolphin, at the time in question, was the only offshore drilling rig owned by Dolphin S.A. working in the Southeast Asia area. Dolphin S.A., however, also operated a workover rig located offshore Indonesia and owned by Union-Indonesia. There is no indication that Buenaflor ever worked on the workover rig.

4. Anderson officed in Singapore at the offices of Dolphin International PTE, Ltd., a Singaporean limited corporation, the stock of which was wholly owned by Dolphin S.A. Anderson was responsible for marketing the Bali Dolphin and its tender vessel, the Green Dolphin, and for keeping these vessels with crews and in operation in Southeast Asia. He usually spent two weeks of every month on the drilling rigs. Anderson was also managing director of Dolphin International PTE, Ltd.

office, which consisted of eight to ten employees, was M.L. King,[5] the rig manager and drilling superintendent for the Bali Dolphin, as well as an administrative support staff, all of whom at the time in question lived in Singapore.[6]

In November 1976, Dolphin S.A. entered into an offshore drilling contract with appellee Union Oil Company of Indonesia ("Union-Indonesia") whereby Dolphin S.A. agreed to drill offshore exploratory wells for Union-Indonesia in its concession areas off the coast of East Kalimanton.[7] Under this contract, Dolphin S.A. agreed to drill the wells using the Bali Dolphin/Green Dolphin unit. Union-Indonesia agreed to obtain all permits and licenses from the Indonesian government for the drilling operations contemplated by the contract.[8] The contract between Union-Indonesia and Dolphin S.A. was signed and partially negotiated by Anderson in either Singapore or Djakarta, Indonesia, although it was first approved in principal in the United States. Payments under the contract were made by Union-Indonesia to Dolphin S.A. in Balikpapan.

Union-Indonesia is a California corporation, which conducts its drilling operations solely in Indonesia. It is a wholly owned subsidiary of appellee Union Oil Company of California ("Union-California") which is also a California corporation. Both corporations maintain their principal places of business in Los Angeles, California, and, like the Dolphin companies, they have the same office address. Union-Indonesia also maintains offices in Djakarta and in Balikpapan.

Appellants' decedent, Joseph Roman Buenaflor ("Buenaflor") was hired by Dolphin S.A. in Singapore on August 2, 1974, to work as an electrician. Buenaflor signed a standard expatriate employment contract, which was written in English. The contract provided, among other things, that Buenaflor was covered by the company's group insurance plan, which was placed with Philadelphia Life Insurance Company. Pursuant to Buenaflor's request at the time he was hired, Dolphin S.A. deposited his paychecks, which were drawn on its bank account at Capital National Bank in Houston and made payable in U.S. currency, into an account maintained by Buenaflor at the Bank of America in San Francisco, California.[9] Buenaflor, however, remained at all times a citizen of the Philippines and maintained his permanent residence there in Cavite City.[10]

---

**5.** The record shows that King was the immediate supervisor of the two tool pushers on the Bali Dolphin, Harold Lynn Ogden and A.R. Schexnider. Ogden and Schexnider received their instructions, direction, and supervision from either King or his superior, Anderson. King divided his time between the rig and the Singapore office, and was responsible for the day-to-day operation of the drilling equipment.

**6.** Although Anderson was in daily contact with the Houston office by telex or telephone, usually providing it with drilling reports, the day-to-day decisions respecting the activities and operations of the Bali Dolphin were made by him or King or by personnel on the rig.

**7.** In 1968, Union-Indonesia and the Indonesian National Oil Company had entered into a production sharing agreement respecting the East Kalimanton area, which continued in force through the time of the events in suit. At the time of the accident, Union-Indonesia had obtained production from five fields offshore East Kalimanton. Before the Dolphin S.A.-Union-Indonesia agreement of 1976, Dolphin S.A. had drilled offshore wells for Union-Indonesia under other agreements in the Attaka Field. The Bali Dolphin had also worked for Union-Indonesia before the 1976 agreement, but not in the Attaka Field.

**8.** The Indonesian government made periodic safety inspections of the drilling unit.

**9.** Buenaflor's paychecks were handled pursuant to a 1972 service contract between Dolphin S.A. and Dolphin, Inc. whereby Dolphin, Inc. performed, among other things, various accounting and risk management services for Dolphin S.A. Dolphin, Inc. handled the payroll for U.S. expatriate personnel working for Dolphin S.A. and for Third Country nationals, and sent the money wherever the employee requested. Local Singaporean nationals were paid by Dolphin S.A.'s labor contractor in Singapore. Dolphin, Inc. was paid a fee by Dolphin S.A. under this agreement. *See* note 24, *infra*.

**10.** Buenaflor never lived or worked in the United States, though he could speak and write in English. Although Buenaflor worked offshore Indonesia for the two years before his death,

After being hired by Dolphin S.A., Buenaflor was assigned to the Green Dolphin, which subsequently joined with the Bali Dolphin. After 1975, the Green Dolphin and the Bali Dolphin were stationed in shallow water areas off the coast of Balikpapan, in the Makasar Strait.[11] Buenaflor would work on either the rig or the tender, wherever electrical problems arose. On the morning of September 16, 1977, the Bali Dolphin capsized and sank while being towed a short distance to a new drilling site in the Makasar Strait.[12] The sinking occurred about five miles from the shore in Indonesian territorial waters. The rig was being towed by three tug boats, the Permina Supply No. 6, the Permina Supply No. 15, and the Permina Supply Sentoso, each owned, operated, and crewed by P.T. Pertamina Tongkang ("Pertamina"), an Indonesian corporation which was an affiliate of the Indonesian National Oil Company, P.N. Pertambangan Minjak Dan Gas Bumi Nasional. Dave Hill, at that time an employee of Union-Indonesia who was on board the Bali Dolphin when the accident occurred, was in command of the rig and was coordinating the movements of the tugs which, under the Dolphin S.A.-Union-Indonesia drilling contract, was Union-Indonesia's responsibility. Also on board the Bali Dolphin were five Dolphin S.A. "expatriate employees," among them Buenaflor, and Harold Ogden, who in King's absence was the acting rig manager, and seven Dolphin S.A. Indonesian (or local) employees.[13] It is undisputed that Buenaflor was drowned in the sinking while in the course and scope of his employment with Dolphin S.A. He had been on board that day so as to be able to moniter the electrical equipment when the rig reached its new location and was jacked up.

At the time of the accident, the day-to-day decisions, supervision, and control of the activities and operations of the Bali Dolphin, and the implementation of policy or decisions made in Houston, were carried out and made in Singapore or Indonesia by Anderson and his staff.

On September 14, 1978, appellant Bruce A. Bailey, as special administrator of the estate of Buenaflor,[14] filed a wrongful

Dolphin S.A. had the right under his employment contract to change the location of his work at any time and to transfer him to different areas. The record, however, shows that Dolphin S.A. exercised this right only once, when Buenaflor was assigned to a drilling rig, the Borgsten Dolphin, which was brought from Japan to Los Angeles, California in late 1976. Buenaflor made the voyage because the rig had electrical problems. The trip began in September, and Buenaflor was released from the rig in December. After spending two days with his brother in California, Buenaflor left the United States and returned to Southeast Asia.

11. The record does not give the exact date when Buenaflor was assigned to the Bali Dolphin. Appellants, however, state in their brief that for two years Buenaflor commuted by jet every two weeks from Singapore to Balikpapan (about 1,500 miles), where he worked offshore. The jet was chartered by Union-Indonesia and transported the different crew changes for all contractors and its own personnel. Although the record is unclear, it appears that Buenaflor usually spent his time off the drilling unit in Singapore. Both Ogden and Schexnider resided there during their time off.

12. The record shows that the destination for the Bali Dolphin was a four-hour tow from its former drilling site. The rig had just completed its fifth or sixth well for Union-Indonesia. At the time of the sinking, the Green Dolphin was still at the old drilling site.

13. Both American citizens and Third Country nationals signed standard American "expatriate" contracts. See note 24, infra. Ogden had been one of the tool pushers on the Bali Dolphin since 1975, and, before the accident, he had worked with Buenaflor for two years. Ogden testified at his deposition that during the two years before the accident, the Bali Dolphin had always worked in Indonesian territorial waters. See note 11, supra.

14. The real plaintiffs in interest are Buenaflor's widow, Le Thi Cay Buenaflor, and his children, Jose Roman Buenaflor, Victor Buenaflor, Victoria Buenaflor, and Marina Buenaflor. Although Mrs. Buenaflor is a Vietnamese citizen, she and her children, who are citizens of the Philippines, are all residents of Cavite City. None of them has ever been a United States resident or citizen.

Bailey is a member of a Burlingame, California law firm, who initially represented Buenaflor's estate before the suit was transferred to Texas. Bailey was appointed special administrator by order of the superior court of the city of San Mateo, California.

death suit in the federal district court for the Northern District of California against Dolphin, Inc., Union-Indonesia, Pertamina, the three tug boats involved in the accident, and Insurance Company of North America ("INA").[15] Dolphin, Inc. filed a motion for dismissal which attacked both the personal and subject matter jurisdiction of the court, venue, and alleged a failure to state a claim upon which relief could be granted. Fed.R. Civ.P. 12(b). The district court, without acting on the other grounds in the motion, found that it lacked personal jurisdiction over Dolphin, Inc., and therefore transferred the entire case to the Southern District of Texas, Houston Division, pursuant to 28 U.S.C. § 1406(a).[16] Thereafter, appellants amended their complaint to add as defendants, Dolphin S.A. and Union-California. Pertamina and its three tugs were voluntarily dismissed.[17] Appellees then moved to dismiss the action based on the doctrine of *forum non conveniens.*[18]

■ The Texas district court, after first applying the choice of law factors of *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), and *Hellenic Lines, Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), determined that

15. The original, and the first and second amended complaints misnamed Union-Indonesia and Pertamina. Union-Indonesia was referred to therein as "Union Oil Company." Although stating that it was "improperly named and served herein as Union Oil Company," Union-Indonesia answered the complaint. Pertamina was referred to as "Pirmina Supply, a corporation."

 INA carried the liability insurance on the Bali Dolphin and the Green Dolphin for Dolphin, Inc. and Dolphin S.A. Part of appellants' complaint alleged that INA fraudulently obtained a settlement agreement from Buenaflor's widow releasing Dolphin, Inc., Dolphin S.A., and INA for $10,000. The settlement was negotiated, signed, and consummated in the Philippines, and was procured there by a Singapore-based employee of Dolphin, S.A. This amount was tendered back to INA in the appellants' complaint. INA was not sued in respect to Buenaflor's death, or on any of the claims purportedly discharged by the release, or on any of its insurance policies, but solely to set aside the release and alternatively for damages for its wrongful procurement.

16. Appellants argue that since the case was transferred from California to Texas, appellees cannot be permitted to contend that Texas is an inconvenient forum. They rely on *INA v. Ozean/Stinnes-Linien and M/V Wurttemberg,* 367 F.2d 224 (5th Cir.1966). There, however, respondents, in a motion to transfer the case pending against them from Louisiana to Georgia, contended that Savannah, Georgia was the only logical forum in this country to try the case. The case was transferred and then respondents moved to dismiss on the basis of *forum non conveniens* in favor of Germany. The Georgia district court granted the motion, but was reversed by this Court, holding that in view of their prior representations respondents could not be permitted to contend that Georgia was, after all, not the most appropriate place to try the case. Here, appellees made no such

representations. Indeed, Dolphin Inc.'s motion asked for a dismissal rather than a transfer.

17. Apparently, service of process was never attempted or made on Pertamina or its three tugs.

18. Although Dolphin, Inc., Union-California, and INA did not file motions to dismiss based squarely on the doctrine of *forum non conveniens,* the district court's order of dismissal was apparently applicable to all defendants, and has been so treated by all parties on appeal. In pleadings filed while the case was pending in the Northern District of California, INA did allege that the district court there was an inconvenient forum and that the action against it should be dismissed or transferred to another forum. Dolphin, Inc. attacked the subject matter jurisdiction of the California federal court by alleging that American law was not applicable to appellants' claim and, as described in note 16, *supra,* also questioned venue in that court. Apparently the Texas district court and the parties regarded Dolphin, Inc. as having filed or adopted a *forum non conveniens* motion.

 Before the Texas district court the parties all appear to have treated the express *forum non conveniens* motions of Dolphin S.A. and Union-Indonesia as being controlling with respect to the proper disposition of the case as to all parties. Thus, in a memorandum filed with the Texas trial court plaintiffs noted that "Although neither of the Defendants, Union Oil Company of California or The Insurance Company of North America, have presented Motions to Dismiss in this cause on grounds of Forum Non Conveniens ... this Honorable Court's determination of whether or not the U.S. laws as pled are applicable to this particular transaction necessarily encompasses the entire case against all of the Defendants...." As the parties and the district court have so treated the matter, here and below, we will likewise do so.

American law did not apply to appellants' claim.[19] The court then considered the *forum non conveniens* factors of *Gulf Oil Corporation v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), and decided that appellant's claim could be "more conveniently tried in some other forum and that an injustice would follow if this Court were to retain jurisdiction." The court, however, conditioned the dismissal on the following:

> "Defendants are to submit to service of process in an appropriate foreign court within ninety (90) days of the date of this order; defendants are to waive any statute of limitations defense; and defendants must agree to satisfy any judgment rendered by such court. Should defendants fail to meet any of these conditions, this court will resume jurisdiction over the case."[20]

## II.

### STANDARD OF REVIEW

■ Before a district court dismisses a case based on the doctrine of *forum non conveniens,* it should first ascertain whether American law or foreign law governs the plaintiff's claim. If American law applies, then the district court should normally retain jurisdiction and proceed with the case. If, however, foreign law applies and the foreign forum is accessible, then the district court should determine in which forum the case should be tried, and if it decides that the lawsuit should be tried in the foreign forum, then the court should decline to exercise jurisdiction over the case. *Fisher v. Agios Nicolaos IV,* 628 F.2d 308, 315 (5th Cir.1980), *cert. denied, sub nom., Valmas Brothers Shipping, SA v. Fisher,* 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981).

While the choice of law determination is subject to our *de novo* review, *Phillips v. Amoco Trinidad Oil Company,* 632 F.2d 82, 84 (9th Cir.1980), *cert. denied, sub nom., Romilly v. Amoco Trinidad Oil Company,* 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981), "the *forum non conveniens* determination is committed to the sound discretion of the trial court." *Piper Aircraft Company v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 266, 70 L.Ed.2d 419, 436 (1981). We may reverse a district court's decision on a motion to dismiss based on *forum non conveniens* only if its action constitutes a clear abuse of discretion. *Chiazor v. Transworld Drilling Company,* 648 F.2d 1015, 1017–18 (5th Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982).

## III.

### CHOICE OF LAW

Respecting the district court's choice of law determination, appellants make essentially two contentions: first, that the district court erred in failing to find that the law of the flag of the Bali Dolphin was really American, and that Dolphin S.A.'s base of operations was in the United States, and that these were substantial contacts with this country warranting the application of American law to their claim; and second, that the district court erred in not finding that Buenaflor's allegiance was to the United States, and that this too was a substantial contact with this country. After considering the record before us, we disagree with these contentions.

In *Chiazor,* the decedent, a Nigerian seaman, died from injuries he received while working on a submersible drilling rig sta-

---

**19.** The choice of law analysis for suits brought under the Jones Act and the Death on the High Seas Act is the same. *Borralho v. Keydril Co.,* 696 F.2d 379, 384 n. 6 (5th Cir.1983).

**20.** This order was subsequently amended by the court to further condition the dismissal upon appellees' agreement to accept "all of the deposition testimony, Admission of the Defendants and documentary proof elicited or ordered produced herein, in all three of the other for-

eign forums where they submit to jurisdiction and [to] agree to tax all costs incurred in this cause in connection with the obtaining of such evidence to the courts where they submit to jurisdiction."

The district court certified its order for immediate appeal under 28 U.S.C. § 1292(b), and this Court subsequently granted appellants' application for leave to appeal.

tioned off the coast of Nigeria. The district court dismissed the wrongful death action brought by the decedent's representatives based on *forum non conveniens.* In affirming the lower court, this Court drew a distinction for choice of law purposes between "a true maritime vessel, one plying the seas as an integral part of the shipping industry" and a submersible drilling rig, a "vessel" of the type concerned here. Respecting such a nontraditional maritime vessel, this Court said:

> "Hence, such factors as place of wrongful act, allegiance or domicile of the injured, and place of contract, which may be less substantial in the shipping context, tend to take on added significance under the present circumstances."

Regarding a shipowner's base of operations, the Court held that in the context of the case before it, even if it was assumed that the shipowner's base of operations was in the United States, such was not "the sole controlling factor." Likewise, in *Phillips v. Amoco Trinidad Oil Co.,* 632 F.2d 82 (9th Cir.1980), *cert. denied, sub nom., Romilly v. Amoco Trinidad Oil Co.,* 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981), the Ninth Circuit held, in the offshore drilling context, that the law of the flag (in that case American) "should not be accorded controlling weight because of the facts of this case." The Court reasoned:

"In *Lauritzen,* the Court stated that the law of the flag has traditionally been accorded great weight 'on the pragmatic basis that there must be some law on shipboard, that it cannot change at every change of waters, and no experience shows a better rule than that of the state that owns her.' 345 U.S. at 585, 73 S.Ct. at 930. This rationale does not apply to a drilling vessel whose operations are at a fixed location...." 632 F.2d at 87.

*Chiazor* and *Phillips,* in effect, redistributed the weight to be given the choice of law factors of *Lauritzen* and *Rhoditis* in cases concerning nontraditional maritime vessels not engaged in shipping. *See Phillips,* 632 F.2d at 85 ("Factors that have little significance in one factual setting may warrant greater weight in another").

■ Here, the vessel involved is a non-self-propelled jack-up drilling rig, a nontraditional vessel much like the submersible drilling rig in *Chiazor.* The district court found that the wrongful act occurred in Indonesian territorial waters; that the allegiance and domicile of Buenaflor was the Philippines; and that the place of the contract of employment between Dolphin S.A. and Buenaflor was Singapore.[21] The district court further found that the Bali Dolphin was a Panamanian flag vessel, and that Dolphin S.A.'s base of operations, on a day-to-day basis, was in Singapore.[22] These findings are supported by the record before

---

21. According to the record, the employment contract between Buenaflor and Dolphin S.A. provided that it would be "wholly performable overseas and outside the territorial limits and jurisdiction of the United States of America"; and that if he were injured or became ill from occupational causes he would be returned to his "point of origin" and then be entitled to any "accrued vacation pay in addition to Workman's Compensation or other Social Security or similar benefits to which he may be entitled from the government of his country of origin." Finally, the contract provided that Panamanian law would apply "[f]or purposes of resolving any disputes with the Company or with anyone else pertaining to Employee's rights or the rights of his estate or personal representative...." Appellees, however, have not contended that Panamanian law should govern appellants' claim or that Panama is where the case should be tried. *See* note 24, *infra.*

22. The district court further found that the day-to-day operations of Union-Indonesia as they related to the Bali Dolphin were conducted out of Balikpapan. As *Chiazor* and *Phillips* indicate, it is the base from which the rig is operated on a day-to-day basis rather than the base of operations of the corporate or ultimate owner of the rig which is important for choice of law purposes. Here, if the focus were upon the ultimate ownership of the Bali Dolphin, it would point to the application of Norwegian law. As in *Chiazor,* even if we assumed that the Bali Dolphin was a U.S. flag vessel, that it was owned by a U.S. corporation, and that the ultimate base of operations was in the United States, in view of the more substantial contacts with Indonesia, Singapore, and the Philippines, American law would not apply where, as here, the day-to-day operational decisions were made in Singapore and Indonesia.

us and are not clearly erroneous.[23] Although appellants contend that the conditions of Buenaflor's employment, his treatment by his employer, and his ties to the United States, show that he should be treated as an American seaman with allegiance to the United States rather than to the Philippines,[24] the district court found and

23. In their brief, appellants state, in a footnote, that disputed fact issues must be resolved in their favor since they, they maintain, appellees' Motions to Dismiss must be treated under Fed.R. Civ.P. 12(b)(6) as motions for summary judgment. We hold that the motions were properly resolved by the district court. *See Borralho v. Keydril Co., supra.* We observe that the controlling primary facts were essentially undisputed, the material questions being as to their legal significance.

We also reject the district court's suggestion that in *Chiazor* this Court departed from the "substantial contacts" test and applied instead a stricter "significant relation" test. In *Chiazor,* this Court adhered to the "substantial contacts" test as reflected at 648 F.2d at 1018. ("[E]ven assuming a U.S. base of operations, the *substantiality* of the contacts herein with Nigeria warrants the non-application of American law.") *(Emphasis added.)* Although the district court stated that it was adopting the "stricter interest analysis approach," the court nevertheless found that the "contacts with this forum lack the *substantial* relation which would justify the application of American law." (Emphasis added.)

24. Specifically, appellants argue that the following facts demonstrate Buenaflor's allegiance to the United States and that appellees are estopped to deny that American law applies to their claim:

(1) Buenaflor's employment under a standard American expatriate contract.

As appellees point out, however, this fact has little significance, since different contracts were used for the local nationals, be they Indonesian or Singaporean workers, because of the labor laws of their countries and because they had to be hired through local labor contractors. Anyone who was not an Indonesian or Singaporean was an expatriate and signed an expatriate contract. Buenaflor, being a Filipino citizen and permanent resident, was therefore considered an expatriate. That did not make him, however, a U.S. citizen. Indeed, the contract recognizes that Buenaflor is a Philippine resident with a Philippine passport. Moreover, nothing in his employment contract indicated that American law would apply to Buenaflor in any matter arising out of the employment relation with Dolphin S.A.

(2) The 1976 drilling contract between Dolphin S.A. and Union-Indonesia.

Appellants argue that because this contract provides that Texas law would govern any dispute arising out of its performance, American law applies here. Buenaflor was not a party to this contract, and in fact, his own employment contract was signed two years before the drilling contract. When the case was dismissed no cross-claims had been made by Dolphin S.A. or Union-Indonesia against each other. This drilling contract plainly does not support appellants' argument.

(3) Buenaflor's treatment as an American.

Appellants argue that because Buenaflor was paid in U.S. currency in the United States, his payroll and personnel records were kept in Houston, and Dolphin S.A. carried the same type of disability and life insurance on him as it did on its American seamen, he should be considered as an American. Of course, as stated above, the evidence shows that Buenaflor asked to be paid in U.S. currency at his bank account in California. Even many of the local nationals could be paid in U.S. currency if they desired. Though Buenaflor's contract provided that he would be compensated in U.S. currency, other evidence in the record indicates that expatriate employees were in fact paid in whatever currency they desired. The fact that Dolphin S.A. chose to keep his employment records in Houston and that it chose to insure all its expatriate employees with American carriers does not alter the *undisputed* fact that Buenaflor remained a Filipino citizen and resident, who had never been a United States resident or citizen. The fact that American-based companies provide insurance to their expatriate workers does not, by itself, make those workers Americans for choice of law purposes.

(4) Buenaflor's unacted on intention to attempt, at some future time, to immigrate to the United States.

We observe that Buenaflor had not so much as initiated any visa or similar application. This intention is not sufficient for choice of law purposes. *See Nunez-Lozano v. Rederi,* 634 F.2d 135 (5th Cir.1980).

(5) Buenaflor's voyage to the United States.

As shown in note 10, *supra,* this was a fortuitous temporary visit, the time spent here was of most limited duration, and there was never any United States residence.

(6) Evasion of American law.

Appellants, relying on some statements made by Anderson during his deposition, argue that Dolphin S.A. was incorporated in Panama to evade the obligations of American law. Anderson, however, admitted that he was not a lawyer and had no involvement in the formation of Dolphin S.A. Anderson also testified that the "Norwegians were looking at it [the corporate setup] strictly from a taxation point of view. That's what I concluded, that was their main concern. To tell you what else, what other points of view they were looking at, I couldn't

the record before us *conclusively* shows that Buenaflor remained a Filipino citizen all of his life and that he maintained his *permanent* residence in the Philippines at all times.

Appellants, however, argue that *Chiazor* is distinguishable from the instant case and that its reasoning is inapplicable here, because that case concerned a local national, who was employed locally by a local concern, and was injured in the territorial waters of his own country while serving as a member of the crew of a United States offshore drilling vessel; whereas here, the case concerns a Third Country national, who was injured while working off the coast of a foreign country for an American company on an American drilling rig. Appellants, in effect, assert (1) that the holding of *Chiazor* is binding only where the plaintiff's allegiance, the place of the employment contract, and the place of the wrongful act all coincide, and (2) that the weight given the factors respecting ownership of the vessel and its base of operations is increased when those factors coexist in the United States and where none of the other factors coexist in any other country. We do not find these considerations to be controlling here.

There is nothing in the *Chiazor* opinion which affirmatively indicates that the analysis and the result respecting the application of American law would have been any different had Chiazor been a citizen and domiciliary of a foreign country other than Nigeria, where all the other choice of law factors remained the same, or that all of the factors emphasized and given added significance in *Chiazor* must coincide in a

*single* nation in order to retain their significance as concerns the choice of law analysis respecting nontraditional vessels. As pointed out in *Chiazor* and *Phillips,* the distinction made there is based on the fact that unlike traditional maritime vessels, the operations of offshore drilling rigs tend to be conducted in a more permanent fashion off the coast of a foreign country, and the "fortuitous circumstances" respecting the place of wrongful act and the place of contract that were given lesser significance in connection with traditional maritime vessels in *Lauritzen* are not present in the offshore drilling rig context. Appellants, however, argue that the weight given the factors in *Chiazor* should not apply here because Buenaflor worked internationally for Dolphin S.A., and the place of his death and his contract was therefore fortuitous. Yet the record shows that Buenaflor had worked offshore East Kalimanton, Indonesia on the Bali Dolphin/Green Dolphin unit for about two years before his death, except for one relatively brief trip to the United States in another connection. *See* note 10, *supra.* Thus, the greater weight given by the district court to the place of the wrongful act, and to the place of contract was proper since the fact that Buenaflor was drowned off Indonesia, where the drilling operations were conducted and where he performed his contract for some two years, was clearly not fortuitous.

It is certainly true that where the factors emphasized in *Chiazor* all coincide in one country, the choice of law determination points strongly to the application of that country's law, but it does not follow that the application of American law is required, as if by default, where these fac-

---

say." In any event, even assuming that Dolphin S.A. is an American corporation will not change the result here. *See Chiazor; Phillips.*

Appellants also argue in this connection that the same facts should lead us to treat the Bali Dolphin's registration as if it were American. But even if we did so, this would not change the result. *See Phillips, supra; Zekic v. Reading & Bates Drilling Co.,* 536 F.Supp. 23 (E.D. La.1981), *aff'd,* 680 F.2d 1107 (5th Cir.1982). Moreover, while the "convenience" nature of foreign registration may frequently minimize or even eliminate its significance as an independent factor *affirmatively* pointing *away* from the application of American law, that does not mean that such registration can be *transformed* into United States registration so as to invoke the rule, cited in this regard by appellants, that "[b]y taking out registry in this country, the shipowner consents in effect to the application of the law of the United States." Gilmore and Black, *Law of Admiralty* (2nd Ed. 1981) § 6–64, p. 477. Here, it is *undisputed* that the shipowner did *not* take out United States registry or consent to the application of United States law, but rather did the virtually exact opposite.

tors are spread among several other foreign countries, and the only contact with the United States remains ultimate American ownership or control of the business ventures engaged in the drilling operation.[25] In other words, the substantiality of the base of operations factor or the law of the domicile of the ultimate owner, in an offshore drilling rig-nontraditional maritime context, does not increase merely because the factors given added significance in *Chiazor* are spread among more than one foreign nation. This is illustrated by *Martyn v. Transworld Drilling Company, Ltd.,* No. 78–3423 (E.D.La., November 29, 1979), *aff'd,* 619 F.2d 82 (5th Cir.1980), and by *Zekic v. Reading & Bates Drilling Co.,* 536 F.Supp. 23 (E.D.La.1981), *aff'd,* 680 F.2d 1107 (5th Cir.1982).

In *Martyn,* the plaintiff was a citizen of Ireland, who was injured while working on a drilling platform located in the North Sea off the coast of the United Kingdom. It was unclear whether plaintiff's employment contract was signed in Ireland or in the United Kingdom, yet the district court held that the contacts with the United States were insufficient to warrant the application of American law even though both plaintiff's employer and the rig owner, as here, were subsidiaries of American-based corporations. In *Zekic,* the plaintiff was a citizen of Yugoslavia who was injured while working aboard a jack-up drilling rig in Italian territorial waters. Plaintiff's employment contract was signed in Italy. The rig flew the American flag. Both plaintiff's employer and the rig owner were American corporations. Relying on *Chiazor,* the district court held that Italian, not American, law applied and dismissed the case. This Court affirmed the district court's dismissal in both cases.

■ In view of the circumstances of this case and their similarity to *Chiazor, Martyn,* and *Zekic,* we hold that the district court correctly concluded that American law did not apply to appellants' claim. The contacts with Indonesia, Singapore, and the Philippines are clearly more substantial than those with the United States.[26]

## IV.

### FORUM NON CONVENIENS

In reaching its decision to conditionally dismiss the case based on the doctrine of *forum non conveniens,* the district court found (1) that many of the crucial witnesses to the accident lived in Southeast Asia; (2) that Pertamina, the Indonesian towing company which owned and operated the three tugs that were towing the Bali Dolphin when she capsized and sank, was not amenable to process in the Southern District of Texas; (3) that all the real plaintiffs in interest, Buenaflor's widow and her children, lived in the Philippines; and (4) that the Bali Dolphin was still operating in Southeast Asia. The court also noted that retention of the case would require it to apply foreign law, and that the case would add to the court's already congested docket.

---

**25.** Although a sufficient American interest in a particular transaction can rest on the presence of even one substantial contact between the transaction and this country, the substantiality of that contact must be compared with the substantiality of the contacts with other countries. As the Ninth Circuit said in *Phillips:* "Substantiality is a relative term, and *Lauritzen* requires that we compare the substantiality of our interests in a given transaction with that of other nations." 632 F.2d at 86.

**26.** As stated earlier, Buenaflor was a Filipino citizen and permanent resident. His survivors are also all residents of the Philippines. Proceedings regarding Buenaflor's estate were filed there. The release given INA and the Dolphin appellees was negotiated and signed there. As stated in *Lauritzen,* "each nation has a legitimate interest that its permanent inhabitants be not maimed or disabled from self-support." 345 U.S. at 586, 73 S.Ct. at 930. The contacts with Singapore are also substantial. Dolphin S.A. conducted its operations from there. Buenaflor signed his employment contract there, and he commuted to and from Singapore to the Bali Dolphin in Indonesia. Finally, the contacts with Indonesia are substantial. Indonesia had the power to control and regulate drilling operations being conducted in its waters. The rig's charterer, Union-Indonesia, had its local base of operations there, and of course, the accident occurred in Indonesian waters. The rig was being moved by an affiliate of the Indonesian National Oil Company. Buenaflor's performance of his contract was in large part in Indonesia.

Appellants do not seriously dispute the above-referenced findings, but basically argue that the court erred in dismissing the case because it was fully developed under American law for trial in an American forum. The record, however, shows that only two of the witnesses that had been deposed were examined regarding the merits of the case,[27] and that many of the other important witnesses, including Dave Hill who was coordinating the towing activities on board the Bali Dolphin and the Indonesian crew members of the tugs that were towing her when she sank, had not been deposed. Moreover, the order of dismissal was conditioned on appellees' agreement to accept all of the deposition testimony and other documentary proof in all three foreign forums.

 Appellants also argue that the inability of the appellees to file a third-party action against Pertamina is not an appropriate ground for dismissing the case. In *Reyno*, however, the Supreme Court recognized that the availability of impleader is one of the considerations which may be taken into account in determining whether a case should be dismissed under the doctrine of *forum non conveniens*. *See also Olympic Corp. v. Societe Generale, A/S,* 462 F.2d 376, 379 (2d Cir.1972); *Shepard Niles Crane & Hoist Corp. v. Fiat, S.p.A.,* 84 F.R.D. 299, 305 (W.D.N.Y.1979). While this consideration alone may not warrant dismissal of the case, it may in a close case support a dismissal.

 Appellants' final argument is that the district court abused its discretion by not specifying which of the three other forums was the most convenient one to try the case. We hold, however, that the district court was not required to specify in which forum appellants should file suit. It was within the district court's discretion to leave that decision to appellants where, as

here, the order of dismissal was conditioned on appellees' agreement to submit to service of process in any of the three other foreign forums.[28]

In *Overseas Programming Company, Ltd. v. Cinematographische Commerzanstalt,* 684 F.2d 232 (2d Cir.1982), the Second Circuit held that the district court erred in failing to designate a more convenient forum to which the parties should be relegated. In that case, however, lawsuits regarding the rights in issue were already in progress in three foreign countries, and the Second Circuit felt that the district court had not weighed the relevant advantages of each forum but had only considered the drawbacks of the American forum. *Overseas,* 684 at 234–35. *See also Founding Church of Scientology v. Verlag,* 536 F.2d 429, 436 (D.C.Cir.1976). Although not expressly stated in the district court's order, it is clear that in this case the district court implicitly determined that any of the three Southeast Asia forums—Indonesia, Singapore, or the Philippines—were more convenient than the Southern District of Texas. Moreover, "[t]he objective is not to locate the *forum conveniens,* but to avoid the *forum non conveniens.*" Casad, *Long Arm and Convenient Forum,* 20 Kan.L.Rev. 1–14 (1971).

## V.

### THE ORDER OF DISMISSAL

 Although we hold that the district court did not abuse its discretion in not specifying the particular forum in which appellants' claim should be tried, we understand appellants' uneasiness, and we feel that, in view of the peculiar circumstances of this case, the order of dismissal should have been more carefully drafted to protect appellants' interests. We have therefore decided to reverse and remand the case so that the district court may revise its order

---

27. These two witnesses were Ogden and Schexnider, both tool pushers on the Bali Dolphin and on board her the day she sank. The remaining depositions were concerned primarily with jurisdictional and related choice of law issues.

28. Appellants make no argument on appeal that the three foreign forums are inaccessible or that the remedies provided therein are clearly inadequate. In the district court, appellees filed affidavits respecting the remedies for wrongful death in each country, which were not materially contested by appellants.

to base it upon appropriate conditions. We suggest that the district court give consideration to conditioning the dismissal on the following: that appellees submit to service of process and jurisdiction in the appropriate court in any of the three forums in which appellants shall have filed suit within ninety days of the order of dismissal; that if the appropriate court in any one or two of such foreign forums declines to take or exercise jurisdiction in such a suit filed within the above-mentioned ninety-day period, or within the ninety-day period provided in this clause, that appellees submit to service of process and jurisdiction in the appropriate court in any remaining of such foreign forums in which appellants shall have filed suit within ninety days after the other such foreign forum has finally so declined to take or exercise jurisdiction; that appellees formally waive in each proceeding where suit may be filed in accordance with the herein provided time limits any statute of limitations defense that has matured since the commencement of this action in the Southern District of Texas; that appellees formally agree in the foreign forum where the claim is to be tried, pursuant to suit timely commenced in accordance herewith, to make available in that forum all relevant witnesses or, in lieu thereof, to schedule depositions at a reasonable time and place, and to make available any documents within their control and that any depositions, answers to interrogatories, requests for admission and the like filed herein may be used in the foreign proceeding to the same extent as if they had originated therein; that appellees formally agree in the foreign forum where the claim is tried, pursuant to suit timely commenced in accordance herewith, to satisfy any final judgment rendered by that court; and that should appellees fail to promptly meet any of these conditions, the district court will resume jurisdiction over the case. The conditional order might also provide that it can be made final by appellees (1) if appellants do not file suit in an appropriate foreign court within the various ninety-day time limits above provided, or (2) if the case is timely filed, that appellees have complied with all of the conditions of the order and the appropriate foreign court has not finally declined jurisdiction. Notice of a motion to make the conditional order final, of course, should be given appellants, and appellants given the opportunity to resist the motion on grounds of noncompliance only.[29]

The district court's order of dismissal is reversed and remanded.

REVERSED AND REMANDED.