DeMOSS, Circuit Judge,
dissenting, joined by EDITH H. JONES and JERRY E. SMITH, Circuit Judges, and joined by GARWOOD, E. GRADY JOLLY, and EMILIO M. GARZA, Circuit Judges, as to Part I only:
I am unable to concur with the decision of the majority in two crucial respects: First, I think proper evaluation of the Lauritzen-Rhoditis factors requires that the choice of law determination in this case be made in favor of the law of the United Arab Emirates (“UAE”) rather than that of the United States. Secondly, if United States law is to be applied, we should apply United States law as it existed at the time of the casualty in this case — not as it existed prior to 1972.
I.

Whether United States Law

My differences with the panel on the Lau-ritzew-Rhoditis choice of law factors involve the first factor (place of the wrongful act); the fourth factor (allegiance of the defendant ship owner); and the fifth factor (place of the contract). Looking first at the place of the wrongful act, the majority opinion devotes one sentence to analysis of this subject. It recognizes that “the accident occurred in the territorial waters of the United Arab Emirates” and that since this is a “nontraditional maritime case,” that factor is entitled to “considerable weight.” Coats was injured while on board the Penrod 69, a jackup drilling rig owned and operated by Penrod Drilling Corporation (“Penrod”). At the time of the accident, there is no doubt that the Pen-rod 69 was “located in the Port of Mina Saqr in the territorial waters of the United Arab Emirates.” In my judgment, the fact that the rig was “in port” has crucial significance in this case, because it makes clear that the vessel was within the boundary recognized for international law purposes as the boundary of the United Arab Emirates and within what would be referred to under United States nomenclature as the “inland waters” of Ra’s A1 Khaymah, the particular emirate in which that port is located. The Penrod 69 was within the inland waters of Ra’s A1 Khaymah just like a jackup rig in the Port of Galveston is considered to be within the inland waters of the State of Texas, and like a rig in the Port of Biloxi is within the inland waters of the State of Mississippi. Furthermore, the Penrod 69 had been “in port” for some eight or nine months prior to the date of Coats’ injury. The records are clear that on August 12, 1987, the Penrod 69 was surveyed for its annual condition certificate, and at that time, the survey report indicates, the “vessel lay jacked-up” in this port. The Pen-rod 69 was out of service, deactivated, not operated, and not occupied by any personnel other than a watchman, up until January 1988, when as a result of a new contract for the rig’s use in a Persian Gulf drilling activity, Penrod commenced the task of preparing the Penrod 69 to go back into service. During this interval of deactivation, the Penrod 69 functioned solely as an artificial wharf or dock for the purpose of storing the equipment and facilities thereon, with its legs standing on the bottom of the port and its hull up out of the water. Substantial repairs, replacements and refurbishing activities were *1140 required to prepare the Penrod 69 to resume its offshore drilling function. This work took some four months to accomplish and included the installation of a new derrick. In performing the refurbishing work, Penrod used its own personnel (assumptively the crew of the Penrod 69) and other categories of “contract labor, catering, and service personnel.” Penrod hired MIS to assist in the refurbishing work, and MIS designated Coats to operate the MIS pump that was brought on board to provide pressure to test certain pressurized systems of the rig. The daily reports as to the personnel working on board the rig, which are in the record, reflect that the total number of contract labor, catering, and service personnel always exceeded the number of Penrod personnel. The record does not clearly indicate whether on the date of the injury, April 12,1988, the Penrod 69 was still in a “jacked-up” position, or whether its hull had been lowered into the water. Obviously, if it was still in a jacked-up position, its categorization as a “vessel” in navigation is in serious doubt. Even if it had been lowered into the water, however, the nature and extent of the work going on, and the number of outside personnel deployed in such work, clearly demonstrate that the repair and refurbishing activities were beyond the capacity of the “crew” of the Penrod 69 to accomplish, and that such work could be accomplished only with the ready availability and access of shore-based personnel and facilities. In my view, under these facts, the “place of the wrongful act” element of the Lauritzerir-Rhoditis factors should be given more than just the “considerable weight” that the majority gave it. It should be the controlling factor in the choice of law decision. I have looked for and have been unable to find any Supreme Court decision or Fifth Circuit decision applying United States law to resolve the claim of a shore-side worker injured while assisting in the refurbishing of a jacked-up drilling rig while it was located within the inland waters of another nation. In my view, the majority opinion constitutes an unjustifiable extension of United States law into areas where simple comity among nations requires that the law of the place of the casualty apply.
My second area of disagreement with the panel regarding the Lauritzerir-Rhoditis factors concerns the factor of “allegiance of the defendant shipowner.” I do not quarrel with the majority’s determination that the allegiance of Penrod, as owner of the Penrod 69, is to the United States. But, in my view, the factor of “allegiance of the defendant shipowner” has materiality only in the circumstance where the flag of the vessel and the allegiance of the defendant shipowner are different (i.e. the vessel’s flag is a flag of convenience), and the law of the nation of allegiance of the defendant shipowner can appropriately be applied to the determination of rights between that shipowner and his seaman employee when that vessel is engaged in international commerce. In this case, however, the allegiance of the defendant shipowner is an inconsequential factor for two reasons: First, the Penrod 69 is documented under the United States flag; Penrod’s allegiance is to the United States and there is no flag of convenience involved. Secondly, and more importantly, both the district court and the majority opinion recognize that there was no employment relationship — as seaman or otherwise — between Penrod and Coats. The majority’s use of the allegiance of the defendant shipowner as a factor in tipping the scales in favor of application of United States law would, in my judgment, be improvident even if the only defendant in this case were Penrod, because that factor should be applied only where there is an employment relationship between the injured plaintiff and the defendant shipowner. But Penrod is not the only defendant in this case, and the other defendant, MIS, is not a shipowner; it is an entity which was created by and whose allegiance is owed to the laws of the United Arab Emirates, and it is in fact the employer of Coats. The majority gives no serious consideration to the key distinctions in this case (1) that Coats was not an employee of the defendant shipowner, Penrod, but was an employee of MIS; and (2) that the trial court found that Coats was not a Jones Act seaman of Penrod. I suggest that the Lauritzerir-Rhoditis factors assume an employment relationship between the injured seaman-plaintiff and the defendant shipowner, and that when that relation *1141 ship does not exist, the allegiance of the shipowner should be considered less significant than that of the defendant employer. I have looked and have not found any Supreme Court or any Fifth Circuit decision applying United States law to determine the rights and obligations between a United States citizen injured in a foreign country during the course and scope of his employment with a corporate entity organized under that foreign country’s law. In my judgment, the panel opinion improvidently extends United States law to the set of circumstances involved in this case by giving greater weight to the allegiance of the defendant shipowner than to the allegiance of the defendant employer.
Finally, I question the correctness of the panel decision in evaluating the “place of contract” factor in the Lauritzen-Rhoditis analysis. Here again, the majority misconstrues the significance of this factor. I start out with the language used by the Supreme Court in concluding its discussion of this factor in Lauritzen itself:
“We do not think the place of contract is a substantial influence in the choice between competing laws to govern a maritime tort.”
Lauritzen, 345 U.S. at 589, 73 S.Ct. at 932 (emphasis added). Furthermore, the contract referred to in both Lauritzen and Rho-ditis is the contract of employment between the injured seaman plaintiff and the defendant ship owner. There is no such contract between Coats and Penrod in this case; whatever contract of employment there was in this case existed between Coats and MIS, who did not own any vessel and was essentially a shore-based supplier of services to companies engaged in exploration and development of oil and gas. I recognize that Coats was recruited by representatives of MIS at his home in Mississippi and that the basic terms of his employment agreement were verbally negotiated and orally agreed upon during this recruitment visit. However, it is clear beyond doubt that he was recruited and “employed” to work for MIS, not for Penrod, and to work in the United Arab Emirates, not aboard any particular vessel. Furthermore, it is clear that in order for Coats to get the necessary visa to enter the United Arab Emirates, Coats and MIS “executed an Arabic contract,” and that Coats then applied for and received the necessary work permit from the UAE which permitted him to reside ashore there in the UAE during his employment. The record is clear that Coats performed his duties for MIS at locations of oil and gas wells on shore in the UAE as well as offshore in the Persian Gulf, and at warehouses and dockside facilities in the UAE. This existence of a work permit is a special factor present in this case which has not been present in any of the other choice of law cases cited in the majority opinion. Presence in the UAE and acceptance of a UAE work permit would unquestionably subject Coats to the criminal laws and civil laws of the UAE had his injury occurred on land. In my view, Coats’ acceptance of a work permit necessitates a determination that the law of the UAE should apply to an injury occurring on the waters of a UAE port during employment under that UAE work permit.
In his original appellee’s brief, Coats argued: “U.S. Maritime Law applies whenever a U.S. citizen is injured on a U.S. flag drilling vessel anywhere in the world.” (p. 52). The cases cited by Coats for that proposition do not support his assertion. But the majority opinion in effect arrives at the same conclusion by misinterpretation and misevaluation of the Lauritzen-Rhoditis factors. Because I think such a conclusion is bad law under the facts of this case, and that it will produce undesirable effects when applied as a precedent, I would reverse the district court’s choice of law determination and remand the case to the district court for retrial in accordance with the laws of the United Arab Emirates.
In arriving at this result, I rely on the following line of Fifth Circuit cases: Chiazor v. Transworld Drilling Go., Ltd., 648 F.2d 1015 (5th Cir.1981), cert. denied, 455 U.S. 1019, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982); Zekic v. Reading & Bates Drilling Co., 680 F.2d 1107 (5th Cir.1982); Bailey v. Dolphin Intern., Inc., 697 F.2d 1268 (5th Cir.1983); Kobe v. Phillips Petroleum Co., 730 F.2d 211 (5th Cir.1984); Schexnider v. McDermott Intern., Inc., 817 F.2d 1159 (5th Cir.1987), cert. *1142 denied, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987); and Fogleman v. ARAMCO, 920 F.2d 278 (5th Cir.1991). All of these cases involve “nontraditional” vessels similar in nature and function to the Penrod 69, and all of these determined that the law of another nation, other than the United States, applied.
II.

What United States Law

Having decided that United States law shall apply, the district court expressly reached the following conclusions (which the majority opinion inferentially affirms):
1. That the United States Longshoremen and Harborworkers Compensation Act (“LHWCA”) could not apply because it applies only to injuries or death occurring “on navigable waters of the United States.”
2. That the Jones Act was inapplicable (i) because there was no employment relationship between the plaintiff Coats and Penrod, the owner and operator of the Penrod 69; (ii) because Coats was aboard the Penrod 69 only for one day, the day he was injured, and therefore had no permanent connection to that vessel; and (iii) because there was no common ownership or control by his employer, MIS, of any of the six offshore drilling rigs on which Coats worked during his employment.
3. That the general maritime law of the United States would be applied, including specifically the concept of Sieracki seaman status originating in the case of Seas Shipping Co. v. Sieracki, 328 U.S. 85 [66 S.Ct. 872, 90 L.Ed. 1099] (1946), with its concomitant availability of the warranty of unseaworthiness for the benefit of Coats.[1]
The judicially manufactured concept of Sier-acki seaman’s status remained a vibrant part of United States law from its creation in 1946 until Congress passed the 1972 amendments to the LHWCA, which expressly removed the right of recovery under the warranty of seaworthiness for individuals covered by that Act. The district court recognized some disagreement in the law as to whether the 1972 amendments to the LHWCA also abolished Sieracki relief for individuals not covered by the LHWCA. But relying on two Fifth Circuit cases, Aparicio v. Swan Lake, 643 F.2d 1109 (5th Cir.1981), and Cormier v. Oceanic Contractors, Inc., 696 F.2d 1112 (5th Cir.) cert. denied, 464 U.S. 821, 104 S.Ct. 85, 78 L.Ed.2d 94 (1983), the district court concluded that, “Coats comes squarely within one of the so-called ‘pockets of Sieracki seamen remaining after the 1972 amendments.’ Aparicio, 643 F.2d at 1118 n. 17.” Accordingly, the district court allowed Coats to proceed under the general maritime law against Pen-rod on both negligence and unseaworthiness theories.
I disagree with the majority’s affirmance of the district court, (1) because I believe the Fifth Circuit precedents relied upon by the district court can no longer be supported in light of the policies stated by a unanimous Supreme Court in Miles v. Apex Marine Corp., 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990); and (2) because the majority opinion wholly ignores the impact of Miles v. Apex Marine on the substantive content of United States general maritime law, even though we were sitting en bane and were in a position to consider such impact. For these two reasons, I respectfully register my dissent. In my view, Miles v. Apex Marine constitutes a major restatement by a unanimous Supreme Court as to the role to be played by the federal judiciary in defining the substantive content of general maritime law. I recognize that the holdings in Miles v. Apex Marine relate only to the specific issues of whether the cause of action for wrongful death of a seaman exists under *1143 general maritime law and whether recovery for loss of society in a general maritime wrongful death action would be permitted. However, the statements of philosophy and approach as to the role of courts in eliminating “anomalies” and achieving “uniformity in the exercise of admiralty jurisdiction” constitute a major redefinition of the interplay between the role of Congress and the role of the courts in defining general maritime law.[2] Because of their extreme relevance to the issue before us in this case, I cite four passages from Miles v. Apex Marine that clearly set forth the new approach and philosophy:
We no longer five in an era when seamen and their loved ones must look primarily to the courts as a source of substantive legal protection from injury and death; Congress and the States have legislated extensively in these areas. In this era, an admiralty court should look primarily to these legislative enactments for policy guidance. We may supplement these statutory remedies where doing so would achieve the uniform vindication of such policies consistent with our constitutional mandate, but we must also keep strictly within the limits imposed by Congress. Congress retains superior authority in these matters, and an admiralty court must be vigilant not to overstep the well-considered boundaries imposed by federal legislation. These statutes both direct and delimit our actions ....
The general maritime claim here alleged that Torregano had been killed as a result of the unseaworthiness of the vessel. It would be inconsistent with our place in the constitutional scheme were we to sanction more expansive remedies in a judicially-created cause of action in which liability is without fault than Congress has allowed in cases of death resulting from negligence. ...
We sail in occupied waters. Maritime tort law is now dominated by federal statute, and we are not free to expand remedies at will simply because it might work to the benefit of seamen and those dependent upon them....
Congress has limited the survival right for seamen’s injuries resulting from negligence. As with loss of society in wrongful death actions, this forecloses more expansive remedies in a general maritime action founded on strict liability. We will not create, under our admiralty powers, a remedy disfavored by a clear majority of the States and that goes well beyond the limits of Congress’ ordered system of recovery for seamen’s injury and death_
Apex, 498 U.S. at 27-36, 111 S.Ct. at 323-28.
The differences in jurisprudential outlook between Aparicio and Apex are the differences between night and day. Aparicio considers judge-made maritime law to be paramount and requires statutory changes to expressly cover all possible circumstances to be effective; Apex recognizes constitutional limitations to the scope of judge-made law and requires accommodation of judge-made law to statutory policy from similar, though not identical, areas of the law. Aparicio looks for and encourages the recognition of “pockets” where judge-made maritime law can survive statutory changes; Apex abhors anomalies and encourages the tailoring and adjusting of maritime law to promote uniformity of rights and remedies. Aparicio puts the burdens on Congress to speak to the intended scope of its 1972 amendments to the LHWCA Act; Apex puts the burden on the federal courts to construe the continued vitality of the Sieracki doctrine in a manner consistent with the 1972 amendments.
I am disappointed that my colleagues in the majority of this en bane consideration failed to follow the counsel of Apex and to seize the opportunity to make United States maritime law applicable to the casualty in this case the same as the law that would have been applicable had this casualty occurred in United States waters. What reason in logic or good public policy is there for federal judges to extend the benefits of the warranty *1144 of unseaworthiness to a United States citizen working as a longshoreman or harborworker in a foreign port when that same warranty of unseaworthiness was statutorily removed as a protection for United States citizens working as longshoremen and harborworkers in United States waters? The precedential effect of the majority’s decision will be truly dramatic, for once this remedy is established for the benefit of United States citizens working as longshoremen and harborworkers in foreign ports, there will not be any logical reason to deny the extension of the warranty of seaworthiness to citizens of other nations working in those same foreign ports on United States vessels. And as a result, the United States courts will become the preferred forum for every worker who is injured on board a United States vessel in foreign ports and desires to seek the benefit of the strict liability of the warranty of unseaworthiness doctrine. I suggest that Apex requires the conclusion that when Congress passed the 1972 amendments to LHWCA, it expressly withdrew the warranty of seaworthiness as a theory of recovery for longshoremen and harborworkers in this country and in effect overruled and reversed the concepts underlying Sieracki seaman status.[3] The federal courts should, therefore, “look primarily to [this] legislative enactment for policy guidance” and should “not create, under our admiralty powers a remedy ... that goes well beyond the limits of Congress’s ordered system of recovery for seaman’s injury and death.” Apex at 27, 36, 111 S.Ct. at 323, 328.
I respectfully dissent, therefore, from the majority opinion, which affirms the decision of the district court to extend Sieracki seaman status to Coats with the right of recovery on the warranty of unseaworthiness against Penrod.

. In another en banc case, this court relied upon the broad policy implications of Miles v. Apex Marine to overturn prior precedents regarding recovery of punitive damages in cases involving claims of willful nonpayment of maintenance and cure. Guevara v. Maritime Overseas Corporation, 59 F.3d 1496 (5th Cir.1995) (en banc).

. See Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 262, 99 S.Ct. 2753, 2757, 61 L.Ed.2d 521 (1979), where the Court stated:
Against this background, Congress acted in 1972, among other things, [n. 11] to eliminate the shipowner’s liability to the longshoreman for unseaworthiness and the stevedore's liability to the shipowner for unworkmanlike service resulting in injury to the longshoreman — in other words, to overrule Sieracki and Ryan. [n. 11] The Amendments also increased compensation benefits, expanded the Act’s geographic coverage, and instituted a new means of adjudicating compensation cases. Robertson, Jurisdiction, Shipowner Negligence and Stevedore Immunities under the 1972 Amendments to the Longshoremen’s Act, 28 Mercer L.Rev. 515, 516 (1977).