**David NICOL, Plaintiff-Appellant,**

v.

**GULF FLEET SUPPLY VESSELS, INC., in personam, et al., Defendants-Appellees.**

**No. 83–3264.**

United States Court of Appeals, Fifth Circuit.

Oct. 9, 1984.

---

Dale W. Poindexter, New Orleans, La., for plaintiff-appellant.

Lemle, Kelleher, Kohlmeyer & Matthews, Edward F. Kohnke, IV, James H. Brown, Jr., Miles P. Clements, New Orleans, La., for defendants-appellees.

Before BROWN, GEE, and RUBIN, Circuit Judges.

GEE, Circuit Judge:

"As a moth is drawn to the light, so is a litigant drawn to the United States." *Smith Kline and French Laboratories, Ltd., et al. v. Block* [1983] 2 All E.R. 72, 74 (C.A.1982) (Denning, M.R.). Today's litigant is David Nicol, a Scottish deep-sea diver, who was drawn to the United States District Court for the Eastern District of Louisiana seeking to recover for personal injuries he suffered off the coast of Abu Dhabi while working aboard an American tugboat for his Liberian employer. When considering two Gulf Fleet pre-trial motions filed in 1982, one to dismiss and the other for partial summary judgment, the district court decided that the laws of the United States do not govern Nicol's various claims brought under the Jones Act and general maritime law. Because he found that foreign law applies to this case, the district judge dismissed the action for failure to state a claim upon which relief can

be granted. From there he proceeded to dismiss for mootness another Gulf Fleet motion for summary judgment filed in 1981 which he thought was being reurged on the ground of *forum non conveniens.* We reverse and remand for further consideration by the district court of issues that our opinion will indicate.

## I. Nicol's Injury.

David Nicol, a domiciliary of the environs of Edinburgh in Scotland, was injured approximately 45 miles off the coast of Abu Dhabi[1] in late 1979 while aboard the M/V GULF QUEEN II, a tugboat flying the American flag and owned by Gulf Fleet Western, Inc., a Delaware corporation.[2] Nicol was employed as a diver by CCC Underwater Engineering, Ltd., a Liberian corporation. He and his fellow divers lived and worked off the lay barge GERALDINE, a vessel believed to be owned by the National Petroleum Company of Abu Dhabi (N.P.C.C.) and used to lay pipelines in the Zakum Oil Field off the coast of Abu Dhabi. The M/V GULF QUEEN II frequently assisted the lay barge GERALDINE in replacing pendant wires.[3] Nicol temporarily boarded the M/V GULF QUEEN II to help replace a pendant wire, an operation which required the assistance of the divers from the lay barge GERALDINE. Nicol was injured when a piece of equipment that was welded to the stern of the M/V GULF QUEEN II broke loose, striking him and knocking him into the sea. His physician's deposition testimony indicates that he lost about 30 percent of the use of his right arm, wrist, and hand. The evidence is uncontroverted that Nicol can never again work as a diver.

No one disputes that an American company, Gulf Fleet Western, owned the M/V GULF QUEEN II when the accident happened. The charter arrangements were a little more complicated. The record is not entirely consistent on the details, but there is evidence to indicate that Gulf Fleet Middle East, Inc.,[4] a Panamanian corporation, bareboat-chartered the tug from Gulf Fleet Western. Gulf Fleet Abu Dhabi, a joint venture between Gulf Fleet Middle East and local Arab interests organized under the laws of Abu Dhabi, then bareboat-chartered the vessel from Gulf Fleet Middle East. Finally, Gulf Fleet Middle East time-chartered the M/V GULF QUEEN II to N.P.C.C. These charters were in effect when Nicol was injured.

## II. The Light is Extinguished.

Nicol filed suit in late 1980. About a year later, after extensive discovery, the

---

1. The Emirate of Abu Dhabi is also known as Abu Zaby. It is one of several independent Arab states forming the federation known as the United Arab Emirates (U.A.E.). The other states are Al Fujayrah, Ash Shariquh, Dubayy (or Dubai), Ras al Khaymuh, Ujman and Umm al Qaywayn. Each emirate has a city or town of that same name. The city of Abu Dhabi is the federation's capital, while Dubai is the largest city and a leading Persian Gulf port. The federal government handles the U.A.E.'s foreign affairs, while the ruler, or emir, of each state controls its internal affairs. The U.A.E. is located at the base of the Persian Gulf and is bordered by the Gulf, Oman, Saudi Arabia, and Qatar. Iran is located directly north across the Gulf from the U.A.E.

2. The M/V GULF QUEEN II was sold to Gulf Fleet Middle East, Inc. in 1983.

3. A pendant wire is used to attach a floating, surface marker buoy to a large anchor block on the ocean floor. These anchor blocks were an integral part of the system whereby the lay barge GERALDINE propelled itself through the water during the course of pipe laying operations. The divers from the lay barge GERALDINE boarded the M/V GULF QUEEN II to replace pendant wires approximately 26 times during the four months preceding Nicol's mishap.

4. Although Gulf Fleet Middle East is a Panamanian corporation, it is ultimately 100% owned by an American company. According to the 10K Statement of Houston Natural Gas in the record for that company's fiscal year ended July 31, 1980, Gulf Fleet Marine Corporation is a Louisiana corporation that is a wholly-owned subsidiary of Potts Industries. In turn, Potts Industries is a wholly-owned subsidiary of Houston Natural Gas. Gulf Fleet Marine Corporation likewise owns Gulf Fleet Western, a Delaware corporation, and Gulf Mississippi International, S.A., a Panamanian corporation. Gulf Mississippi International, S.A., in turn owns Gulf Fleet Middle East, Inc., a Panamanian corporation.

defendants filed a motion to dismiss for lack of subject matter jurisdiction or alternatively, to dismiss based on the doctrine of *forum non conveniens*. The motion was summarily denied in December of 1981 without written reasons. The case had been set for trial in mid-December of that year, but the matter was continued on the court's own motion. The trial was rescheduled to begin in the spring of 1982, but was again continued, this time on the defendants' motion. The defendants filed two more motions in December of 1982. The first was entitled "Motion to Dismiss or, Alternatively, for Summary Judgment" and the defendants' reasons for bringing the motion were stated in a legal memorandum accompanying their motion. In the memorandum the defendants reurged their arguments concerning lack of subject matter jurisdiction because foreign law should apply to Nicol's case, but a discussion of *forum non conveniens* is nowhere to be found.[5] The second motion requested partial summary judgment, contending in an accompanying memorandum that Nicol's claims do not fall under the Jones Act and that he is not entitled to invoke the doctrine of unseaworthiness. Again, *forum non conveniens* is nowhere mentioned. Three days before trial was to begin in January of 1983, the case was continued to the end of May on the court's motion. Then, in April, the district judge ordered that the first of the defendants' motions filed the previous December be treated as a motion for summary judgment and granted it. He did so presumably because he decided that

foreign law applies and, the plaintiff having made no claim under foreign law, the complaint should be dismissed for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[6] Then the judge stated in his order, "IT IS FURTHER ORDERED that the defendants' Motion for Summary Judgment on the grounds of *forum non conveniens* is DENIED AS MOOT." The problem with this adjudication of mootness is that the only motion based on *forum non conveniens* was made and denied back in 1981.[7] The judge must have assumed that the defendants were reurging their 1981 motions in their entirety, even though they said they were not, and despite their failure to mention *forum non conveniens* in their December 1982 filings. As for the defendants' motion for partial summary judgment based on the Jones Act and unseaworthiness, it appears from the record that it was never ruled upon. In any event, it was clear to Nicol that the United States court had sent him elsewhere, and he appeals to us.

### III. Jurisdiction: An Incomplete Analysis.

Our most recent pronouncement regarding the standard of review for choice of law in Jones Act/general maritime law cases is contained in *Koke v. Phillips Petroleum Co.*, 730 F.2d 211, 218 (5th Cir. 1984):

> Before dismissing a case for *forum non conveniens*, a court must first determine whether American or foreign

5. The cases cited in the accompanying legal memorandum were *forum non conveniens* controversies, but the defendants' stated reason for urging dismissal or summary judgment was lack of subject matter jurisdiction.

6. In granting summary judgment, the district judge apparently relied upon the following footnote in *Chiazor v. Transworld Drilling Co., Ltd.*, 648 F.2d 1015, 1020 n. 7 (5th Cir.1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982).

The plaintiffs here asserted a claim based only upon the Jones Act, DOHSA, and the general maritime law of the United States; they failed to assert a claim under Nigerian law. Once the district court determined that

American law as not applicable, it could have properly dismissed the case pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, and, if deposition and affidavits were considered, have granted a summary judgment under Rule 56. See *de Alvarez v. Creole Petroleum Corp.*, 613 F.2d 1240 (3rd Cir.1980). See also H. Watson, Applicable Law in Suits by Foreign Offshore Oil Workers, 41 La.L.R. 827, 828–29 (1981).

7. Unless, perhaps, a motion based on *forum non conveniens* was made in open court, but no such motion appears anywhere in the written record.

law governs that claim. *Bailey v. Dolphin International, Inc.*, 697 F.2d 1268, 1274 (5th Cir.1983). This Court has held that, if American law applies, a federal court should retain jurisdiction. *Fisher v. Agios Nicolaos V*, 628 F.2d 308, 315 (5th Cir.1980), *cert. denied sub nom., Valmas Brothers Shipping, S.A. v. Fisher*, 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981). *But see Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 260, 102 S.Ct. 252, 268, 70 L.Ed.2d 419 (1981). If foreign law applies, however, the court may dismiss if there is a more convenient forum available. *De Oliveira v. Delta Marine Drilling Co.*, 707 F.2d 843, 845 (5th Cir.1983). While the choice of law is subject to our *de novo* review, the court's dismissal for *forum non conveniens* will be disturbed "only if its action constitutes a clear abuse of discretion." *Bailey*, 697 F.2d at 1274.

Before the district judge, the parties in Nicol's case appear to have confused subject matter jurisdiction with *forum non conveniens* and thus to have led him into error. The district judge's order is couched strictly in terms of choice of law. In *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 359, 79 S.Ct. 468, 473, 3 L.Ed.2d 368, 374–75 (1959), Justice Frankfurter recognized that the question whether subject matter jurisdiction exists is often confused with whether the complaint states a cause of action. Nicol argues that the Jones Act affords him a right of recovery for the injuries he suffered in the course of his employment.[8] For Jones

---

**8.** On the date Nicol was injured, the Jones Act, 46 U.S.C. § 688 (1976), provided:

*Any seaman who shall suffer personal injury in the course of his employment* may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. *Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.*
(Emphasis added.) The Jones Act was amended in 1982 as follows:

(a) Application of railway employee statutes; jurisdiction.

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.

(b) Limitation for certain aliens; applicability in lieu of other remedy.

(1) No action may be maintained under subsection (a) of this section or under any other maritime law of the United States for maintenance and cure for damages for the injury or death of a person who was not a citizen or permanent resident alien of the United States at the time of the incident giving rise to the action if the incident occurred—

(A) while that person was in the employ of an enterprise engaged in the exploration, development, or production of off-shore mineral or energy resources—including but not limited to drilling, mapping, surveying, diving, pipelaying, maintaining, repairing, constructing, or transporting supplies, equipment or personnel, but not including transporting those resources by (a) vessel constructed or adapted primarily to carry oil in bulk in the cargo spaces; and

(B) in the territorial waters or waters overlaying the continental shelf of a nation other than the United States, its territories, or possessions. As used in this paragraph, the term "continental shelf" has the meaning stated in article I of the 1958 Convention on the Continental Shelf.

(2) The provisions of paragraph (1) of this subsection shall not be applicable if the person bringing the action establishes that no remedy was available to that person—

(A) under the laws of the nation asserting jurisdiction over the area in which the incident occurred; or

Act purposes, Nicol alleges that his "employer"[9] was any one or all of the Gulf Fleet companies named as the defendants.

Such assertion alone is sufficient to empower the District Court to assume jurisdiction over the case and determine whether, in fact, the Act does provide the claimed rights. "A cause of action under our law was asserted here, and the court had power to determine whether it was or was not well founded in law and in fact." *Lauritzen v. Larsen,* 345 U.S. 571, 575, 73 S.Ct. 921, 924, 97 L.Ed. 1254, 1262.

*Romero,* 358 U.S. at 359, 79 S.Ct. at 473, 3 L.Ed.2d at 375. The district judge in Nicol's case did not address whether, for example, Nicol is a Jones Act seaman or whether the Gulf Fleet companies might fall under the Jones Act as "employers" given the facts of this case. Thus, he did not rule on whether his court has the *power* to determine Nicol's claims under the Jones Act, nor did he determine whether Nicol states a valid cause of action under the Act. He determined only that foreign law applies, the first prong in a *forum non conveniens* assessment. Similarly, the district court never discussed its jurisdiction over this case in terms of American general maritime law, nor was the validity of Nicol's cause of action questioned under general maritime law.[10] It is clear from *Romero* that choice of law in Jones Act/general maritime law cases is relevant only to the doctrine of *forum non conveniens* and has nothing to do with subject matter jurisdiction. Thus, the district judge had taken only the first step in a *forum non conveniens* analysis when he dismissed Nicol's case. Consequently he erred, perhaps in finding that American law does not apply and surely in failing to complete the *forum non conveniens* assessment suggested by *Gulf Oil Corporation v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), and its progeny.[11]

IV. Choice of Law.

■ As the case must be remanded, and since the record is silent regarding several of the pertinent factors governing choice of law, we conclude that the interests of justice would be best served by vacating the district court's order in that regard also. We discuss these briefly for such aid as we may be to the trial judge.

Any analysis of choice-of-law in an injured seaman's action must begin with the Supreme Court's decisions in *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), and *Hellenic Lines, Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). Those cases set forth eight factors to be employed in deciding choice-of-law in maritime tort claims: (1) place of the wrongful act; (2) law of the flag; (3) allegiance or domicile of the injured; (4) allegiance of the defendant shipowner; (5) place of contract; (6) inaccessibility of foreign forum; (7) law of the forum; and (8) shipowner's base of operations.

*Lauritzen* and *Rhoditis* also provide guidance as to the weight and significance to be accorded each factor. As to the place of the wrongful act, *Lauritzen* counsels that while the law of the place where the acts giving rise to liability occurred is a commonly accepted solution to the choice of law dilemma, it is of limited application to shipboard torts and is usually modified by the law of the flag. *Lauritzen,* 345 U.S. 571 at 583–84, 73 S.Ct. at 928–929, 97 L.Ed. 1254 at 1268. The opinion implies

---

(B) under the laws of the nation in which, at the time of the incident, the person for whose injury or death a remedy is sought maintained citizenship or residency.

46 U.S.C.A. § 688 (Supp.1984). Congress, however, did not make these amendments retroactive and they do not apply to Nicol's accident.

9. He specifically alleged that he was "an employee or borrowed servant or employee pro hac vice of" the five Gulf Fleet defendants.

10. *Romero* held that a federal district court has pendent jurisdiction on the law side of its docket over causes brought under United States general maritime law when such causes are joined with Jones Act claims. 358 U.S. at 378, 79 S.Ct. at 484, 3 L.Ed.2d at 387.

11. *E.g., Chiazor v. Transworld Drilling Co.,* 648 F.2d 1015 (5th Cir.1981).

that this is particularly so when the tort is committed on the high seas. Regarding the law of the flag:

> Perhaps the most venerable and universal rule of maritime law relevant to our problem is that which gives cardinal importance to the law of the flag. Each state under international law may determine for itself the conditions on which it will grant its nationality to a merchant ship, thereby accepting responsibility for it and acquiring authority over it. Nationality is evidenced to the world by the ship's papers and its flag....

> It is significant to us here that the weight given to the ensign overbears most other connecting events in determining applicable law. As this Court held in *United States v. Flores,* supra (289 U.S. at [137] 158 [53 S.Ct. 580 at 585, 77 L.Ed. 1086]), and iterated in *Cunard S.S. Co. v. Mellon,* supra (262 U.S. [100] at 123 [43 S.Ct. 504 at 507, 67 L.Ed. 894]):

> "And so by comity it came to be generally understood among civilized nations that all matters of discipline and all things done on board which affected only the vessel or those belonging to her, and did not involve the peace or dignity of the country, or the tranquillity of the port, should be left by the local government to be dealt with by the authorities of the nation to which the vessel belonged as the laws of that nation or the interests of its commerce should require...."

*Lauritzen,* 345 U.S. at 584–585, 586, 73 S.Ct. at 929–930, 97 L.Ed. at 1269.

Nicol's accident occurred approximately 45 miles off the coast of Abu Dhabi in the Zakum field. The parties present conflicting affidavits as to whether the Zakum field is within the territorial waters of the Emirate of Abu Dhabi.[12] On remand, the court should resolve the dispute. It does appear to be undisputed that the M/V GULF QUEEN II flew the flag of the United States in 1979, a factor that, even standing alone, can be paramount in suggesting a choice of American law. *Koke,* 730 F.2d at 218.

Nicol is a British subject. *Lauritzen* points out that there is a long standing rule that for jurisdictional purposes the nationality of the vessel is attributed to all her crew. On the other hand, "each nation has a legitimate interest that its nationals and permanent inhabitants be not maimed or disabled from self-support." *Lauritzen,* 345 U.S. at 586, 73 S.Ct. at 930, 3 L.Ed.2d at 1270. *Lauritzen* did not go further with this discussion because the nationality of the seaman and the flag were the same under its facts. Here, Nicol was not a regular member of the crew of the M/V

**12.** We suspect that 45 miles offshore is too far out to be within the territorial waters of Abu Dhabi for purposes of civil jurisdiction over a maritime tort. Information supplied to this Court by the United States Department of State indicates that between 1970 and August 1980, Abu Dhabi claimed a territorial sea of three nautical miles (approximately 3.45 miles) and no additional contiguous zone. While different countries claimed territorial seas of differing breadths in 1979, most coastal states adhered to territorial seas of no more than 12 miles. L. Henkin, R. Pugh, O. Schachter and H. Smit, *International Law Cases and Materials* 311 (1980). *See also:* Convention on the Territorial Sea and the Contiguous Zone, *opened for signature* Apr. 29, 1958, 15 U.S.T. 1606, T.I.A.S. No. 5639, 516 U.N.T.S. 205, arts. 20, 24 (zone of the high seas contiguous to the territorial sea of a state may not extend beyond 12 miles from the baseline from which the breadth of the territorial sea is measured; coastal states may not exercise civil jurisdiction beyond preventing infringement of its customs, fiscal, immigration, or sanitary regulations within its contiguous zone); Convention on the High Seas, *opened for signature* Apr. 29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200, 450 U.N.T.S. 82, art. 1 (high seas means all parts of the sea not included in the territorial sea of a state).

According to our information received from the Department of State, the U.A.E. declared an exclusive economic zone of unlimited breadth in August of 1980. But generally a state may use its exclusive economic zone only for purposes of exploiting natural resources; its civil jurisdiction over a claim such as Nicol's does not extend beyond its territorial waters into the exclusive economic zone. *See* Informal Composite Negotiating Text, Third U.N. Conference on the Law of the Sea, A/CONF.62/WP./10/Rev. 2 (11 April 1980), arts. 55–58 *reprinted in* L. Henkin, R. Pugh, O. Schachter & H. Smit, *International Law Cases and Materials* 378–79 (1980).

GULF QUEEN II, and certainly Great Britain has an interest that Nicol not be added to her public relief rolls. Thus, Nicol's nationality for purposes of the *Lauritzen* instructions is probably British, but the fact that legally he may have been a temporary member of the tug's crew may lessen the effect of the "injured's domicile" factor in this case.

Gulf Fleet Western, owner of the M/V GULF QUEEN II in 1979, is undeniably an American company. Thus, the "allegiance of the defendant shipowner" factor points to the application of American law.

The Supreme Court accorded little weight to the place of contract. *Lauritzen*, 345 U.S. at 588, 73 S.Ct. at 931, 97 L.Ed. at 1271. In *Lauritzen*, as in this case, the seaman did not seek to recover anything due under the contract or damages for its breach. Justice Jackson stated that if contract law is to be considered at all, the law which contracting parties intended to apply should govern. In any event, Justice Jackson's majority did not think the place of contract a substantial influence in the choice between competing laws to govern a maritime tort. *Id.* In the case before us, we know little about Nicol's contract with his Liberian employer, if, indeed, he had one. There is certainly insufficient information in the record to attempt a determination of what law the parties intended to govern any employment contract Nicol may have had. And even if adequate information were at hand, Nicol's accident did not take place on his Liberian employer's property, nor does the diver seek to recover damages pursuant to his employment contract. Even so, on remand the court may wish to determine what law governs Nicol's contract, weak though that influence on its decision may be.

As to the accessibility of a foreign forum in this case, the parties introduced conflicting affidavits on whether Nicol could bring an action in Abu Dhabi.[13] No one has introduced any evidence on the question of whether the courts of Scotland, Liberia, or Panama might be available to the plaintiff. Because no party has adequately proved the law of Abu Dhabi or that of any other possible foreign forum, we are unable to consider it.

The purpose of the *Lauritzen* "law of the forum" factor is to assure that a case will be treated in the same way under the appropriate law regardless of the fortuitous circumstances which often determine the forum. The Supreme Court emphasized that the mere ability to serve American process on the defendants is not enough to impose the law of an American forum on them if it would not otherwise apply. *Id.*, 345 U.S. at 590–592, 73 S.Ct. at 932–933, 97 L.Ed.2d at 1272–73. Thus, we doubt that this factor is of much weight.

Finally, *Rhoditis* teaches that a defendant's American base of operations can be sufficient to support the application of American law. The reasoning of *Rhoditis* was based principally upon the shipowner corporation's American base of operations, but mention was also made of the vessel's frequent calls at American ports. We must consider the base of operations of both the shipowner and the vessel. *See Fajardo v. Tidewater, Inc.*, 707 F.2d 858, 862 (5th Cir.1983); *see also Diaz v. Humboldt*, 722 F.2d 1216 (5th Cir.1984). It is undisputed that Gulf Fleet Western's base of operations is in Louisiana, and it may well be that the base of operations of the bareboat charterer(s) is also there.[14] The

---

**13.** The plaintiff's expert says that the Abu Dhabi court would apply American law. He states that Abu Dhabi would not have jurisdiction over companies not organized under the laws of Abu Dhabi or the U.A.E. The defendants' expert opines that Nicol could recover from his employer under the laws of Abu Dhabi, but does not address whether any of the Gulf Fleet companies would be considered Nicol's employer in the courts of the U.A.E. Based on the parties' submissions as to the law of Abu Dhabi, we are

unable to say one way or the other whether Nicol has either a cause of action or jurisdiction over the defendants in Abu Dhabi.

**14.** Gulf Fleet Abu Dhabi is one-half owned by Gulf Fleet Middle East, a company in which 100% of the stock is owned by Americans. Gulf Mississippi International, S.A., is also wholly owned by Americans. *See generally Baker v. Raymond International, Inc.*, 656 F.2d 173 (5th

M/V GULF QUEEN II made her maiden voyage from New Orleans in 1977, and it is clear that the vessel would have returned to New Orleans in 1978 had extensive repairs not necessitated cancelling the remaining voyage when the tug reached Greece.[15] Thus, it appears that the "base of operations" factor weighs in favor of the application of American law, but it may be of little weight because the day-to-day activities of the tug were probably directed by the time charterer (N.P.C.C.) in Abu Dhabi, and a case can be made for a U.A.E. base of operations for the bareboat charterers.

*Lauritzen* and *Rhoditis* were intended to apply to ocean-going vessels generally, true maritime vessels that ply the seas as an integral part of the shipping industry. Where these vessels are concerned, Gilmore and Black states:

> American law will ... be applied in actions brought on account of injuries suffered on American-flag ships, whether the plaintiffs are American or foreign, resident or non-resident, seamen, harborworkers, passengers, guests or, for that matter, pirates. By taking out registry in this country, the shipowner consents in effect to the application of the law of the United States. This proposition has seemed so self-evident that it appears never to have been questioned.

G. Gilmore & C. Black, *The Law of Admiralty* at 477 (2d Ed.) (1975).

It has now been questioned in this Circuit, however, in the context of drilling rigs. *Koke,* 730 F.2d 211; *De Oliveira v. Delta Marine Drilling Co.,* 707 F.2d 843 (5th Cir.1983) (law of the flag not considered); *Chiazor v. Transworld Drilling Co., Ltd.,* 648 F.2d 1015 (5th Cir.1981), *cert. denied* 455 U.S. 1019, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982) (law of the flag not considered). Beginning with *Chiazor* in

this Circuit, the suggestion is made that the *Lauritzen/Rhoditis* choice of law factors should be applied differently to offshore drilling rigs or vessels so intimately connected with one or just a few such rigs that they remain stationary or move only short distances infrequently. *Koke,* 730 F.2d 211; *De Oliveira,* 707 F.2d 843; *Bailey v. Dolphin International, Inc.,* 697 F.2d 1268 (5th Cir.1983); *Vaz Borralho v. Keydril Co.,* 696 F.2d 379 (5th Cir.1983); *Zekic v. Reading & Bates Drilling Co.,* 536 F.Supp. 23 (E.D.La.1981), *modified* 680 F.2d 1107 (5th Cir.1982). In these drilling rig cases, factors such as the place of the wrong, the domicile of the injured, and the place of contract take on greater significance. *Chiazor,* 648 F.2d at 1019. Thus, the court must analyze the activities of the M/V GULF QUEEN II to determine whether it is to weigh the eight factors in the traditional *Lauritzen/Rhoditis* manner or under the drilling rig variation.

The defendants here insist that their tugboat has been engaged in oil operations in the Middle East almost exclusively since 1977, necessitating the application of the drilling rig rules. But the record establishes the tug's presence in New Orleans, Ras Shakheir (Egypt) and Port Said (Egypt) in 1977; Ras Shakheir; Dubai (U.A.E.); Piraeus (Greece); and "Jubail"[16] in 1978; and two states in the U.A.E. in 1980. The vessel has not been engaged exclusively off the coast of Abu Dhabi since its maiden voyage in 1977. It is also clear that a Gulf Fleet entity out of New Orleans ordered the tug to tow another vessel to the United States in 1978, although the mission was reassigned to another tug when the M/V GULF FLEET II had to put in for extensive repairs on the way. The tug is self-propelled and moves about freely. It is not engaged in the sole service of one drilling rig in a fixed location or even a small

---

Cir.1981), *cert. denied,* 456 U.S. 983, 102 S.Ct. 2256, 72 L.Ed.2d 861 (1982).

**15.** The M/V GULF QUEEN II was towing the dredge JIM BEAN from the Middle East to New Orleans on orders from Louisiana.

**16.** "Jubail," or Jubayl, could be either a port city in Lebanon or another port city in Saudi Arabia sometimes known as Al Jubail or Al Jubayl. The record suggests that the Jubail it refers to is the Saudi Arabian one, but it makes little difference for our purposes.

number of drilling rigs in close proximity. Accordingly, we are not so clear as was the trial court that the M/V GULF QUEEN II is not a true blue-water vessel and that the district court's analysis should not have proceeded under *Chiazor* and its progeny, but rather under the traditional *Lauritzen/Rhoditis* reasoning. On the remand that we direct, the court should re-examine these questions.

VACATED AND REMANDED.