Rogelio J. CUEVAS, et al., Plaintiffs-Appellants,

v.

READING & BATES CORP., a/k/a Reading & Bates Offshore Drilling Co., et al., Defendants-Appellees.

No. 84–2154.

United States Court of Appeals, Fifth Circuit.

Sept. 19, 1985.

Rehearing Denied Oct. 18, 1985.

---

Due' Dodson, deGravelles, Robinson & Casey, Chester J. Caskey, Baton Rouge, La., for Cuevas, et al.

Royston, Rayzor, Vickery & Williams, Ted C. Litton, Houston, Tex., for defendants-appellees.

Before BROWN, WILLIAMS, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This appeal involves a suit brought by nonresident foreign nationals for unpaid wages, and for personal injuries and wrongful death suffered in an accident in foreign waters on a semi-stationary drilling rig owned and operated by United States corporations. The district court first determined that United States law did not apply, and then dismissed the suit on *forum non conveniens* grounds. We affirm.

### FACTS

On October 2, 1980, while positioned about one hundred miles into the Persian Gulf in Saudi Arabian waters, the jack-up drilling ship R/V RON TAPPMEYER encountered a pocket of hydrogen sulfide gas during oil well drilling operations. Fumes killed a number of crewmen, including one United States citizen and several Philippine nationals, and injured others. Reading & Bates Exploration Company, owner of the vessel, had chartered it to Reading & Bates, Inc.—Saudi Arabia Branch ("RBSAB"), a wholly owned subsidiary of another United States corporation, Reading & Bates, Inc. RBSAB, with one exception,[1] employed all the crew of the R/V RON TAPPMEYER. Day-to-day operations were controlled by the RBSAB office in Ras Tanura, Saudi Arabia. RBSAB had

---

1. Appellant Eulogio Chu was an employee of a Saudi catering contractor.

executed employment contracts with each crewmember that provided, *inter alia*, for resolution of any controversies, including disputes arising under the contracts and claims for compensation for injuries or death, by appropriate Philippine agencies, under Philippine law.[2]

On May 19, 1982, the twelve appellants, each of whom is a Philippine domiciliary and citizen, brought this suit in the Southern District of Texas, Houston Division, alleging Jones Act, 46 U.S.C. § 688, and general maritime claims for injury and/or wrongful death sustained while aboard the R/V RON TAPPMEYER, and seeking unpaid wages allegedly due them.[3] On October 18, 1982, appellees moved for dismissal on *forum non conveniens* grounds. On December 6, 1982, appellants filed a motion to transfer the action to a Louisiana federal district court, where the survivor of the lone United States citizen killed in the same accident had initiated suit. The district court conditionally dismissed appellants'

suit by its "Memorandum and Order" on December 7, 1982. 577 F.Supp. 462 (S.D. Tex.1983). The court also refused to transfer appellants' suit to the Louisiana federal court entertaining the parallel United States citizen's suit.[4]

Appellants' Baton Rouge, Louisiana, counsel received no copy of the court's Memorandum and Order, but were alerted to the dismissal by a copy of a letter from appellees' counsel to the court dated December 12, 1982, which acknowledged the court's decision. Appellant's counsel then repeatedly called the chambers of the court in Houston (rather than the clerk of court) in order to ascertain the status of the order. They were unable to make contact with the court in December; they did not, however, request their local counsel to obtain a copy of the order or to contact the court clerk. Houston counsel did finally receive a copy of the dismissal order, which they forwarded immediately by regular mail to Baton Rouge; appellants' counsel

**2.** The contracts recited that "[a]ny disputes arising from this contract shall be resolved by the competent or appropriate government agency of the Philippines in accordance with the laws of the land." The contract also provided that "The COMPANY shall provide the EMPLOYEE workmen's compensation benefits for service-connected illness, injury or death in accordance with the pertinent laws of the Philippines."

The employment contracts called for a one-hundred-twelve-day work period, twelve hours a day, seven days per week, at a fixed salary. Following such work period, the employee would be transported back to the Philippines at company expense for a fifty-six-day paid rest period, following which the employee would be transported back to the drill site. The contract called for return of the employee to his "point of hire, Manila, Philippines, unless this contract is extended by mutual consent of both parties." Normal term of the contract was to be one year, subject to availability of work.

**3.** The complaint asserted jurisdiction on the basis of federal question, admiralty and maritime jurisdiction, and on the basis of alienage jurisdiction, 28 U.S.C. § 1332(a)(2). It recites that the defendants-appellees variously are either Delaware corporations (Reading & Bates Corporation, a/k/a Reading & Bates Offshore Drilling Company, and Reading & Bates, Inc.) or Oklahoma corporations (Reading & Bates Drilling Company and Reading & Bates Exploration Company); that all are licensed to do and are

doing business in the State of Texas; and that all are amenable to service of process through their agent for that purpose in Dallas, Texas. The complaint further asserts that the principal place of business of all the defendant corporations is in Houston, Texas. The complaint also asserts *in rem* jurisdiction over the R/V RON TAPPMEYER and her engines, tackle, appurtenances, etc., on an information and belief assertion that the vessel is (or will be during the pendency of the suit) within the maritime jurisdiction of the district court.

Appellants alleged unseaworthiness of the R/V RON TAPPMEYER and negligence of the corporate defendants or their personnel aboard the vessel as grounds of recovery for injury or death. They asserted a right to maintenance and cure compensation, and damages consequent to the wrongful denial thereof, plus attorneys' fees. The appellants also asserted claims for wages "which they would have earned through the completion of the voyage" for statutory wage penalties, and for attorneys' fees. Each appellant sought compensatory damages of $1.4 million and punitive damages of $1 million. Jury trial was demanded.

**4.** The court, having determined that United States law did not apply and that *forum non conveniens* considerations dictated that the suit should not be brought in a United States court, stated that "it would be improper to burden the [proposed transferee court] with this litigation." 577 F.Supp. at 464.

received it on January 9, 1983. On this same day, appellants filed simultaneously with the district court clerk a notice of appeal and a motion for an extension of time to file notice of appeal. The clerk did not then docket the notice of appeal. Appellants also contacted the clerk directly by telephone; he allegedly told them that the order would not become final for ninety days following the date of signing.[5] The district court, by order entered January 24, 1984, granted appellants' motion for extension of time to appeal, without opinion; the notice of appeal was thereafter docketed by the clerk on January 24, 1984.

On April 13, 1984, appellees filed with the Fifth Circuit a motion to dismiss the appeal as untimely; appellants responded that the delay had been occasioned by excusable neglect, and that the district court's granting of appellants' motion for extension was proper. This motion to dismiss was carried with the case.

## APPEALABILITY

■ None of the parties to this suit has complained that the district court's order of dismissal was not final for purposes of appeal under 28 U.S.C. § 1291. Because courts of appeal are courts of limited jurisdiction, we are obliged to resolve uncertainties of jurisdiction *sua sponte* when they arise. *Koke v. Phillips Petroleum Co.*, 730 F.2d 211, 214 (5th Cir.1984); *Save the Bay, Inc. v. United States Army*, 639 F.2d 1100, 1102 (5th Cir.1981).

Dismissals on *forum non conveniens* grounds have been considered final and appealable as of right. *Koke*, 730 F.2d at 214 (citing *Menendez Rodriguez v. Pan American Life Insurance Co.*, 311 F.2d 429, 432 (5th Cir.1962)). As in *Koke*, the question of finality arises because of the presence of protective conditions contained in the dismissal order. The uncertainty here is whether such conditions operate to destroy finality.[6]

In *Koke*, the order of dismissal on *forum non conveniens* grounds was conditioned upon three requisites: Defendants were to consent to jurisdiction in a single and appropriate foreign forum, waive any limitations defenses, and consent to abide by any judgment rendered by the court of that forum. 730 F.2d at 214. The district court there had in its dismissal order "further indicated that it would 'reassume jurisdiction and move the case towards its resolution' should any of the defendants fail to satisfy the conditions." *Id.* After reviewing the legal principles applicable to a *forum non conveniens* dismissal and the role of the final judgment rule in federal appellate practice,[7] and noting that, "[d]espite the apparent clarity of the general test, ... finality has proved to be an elusive concept," *id.* at 215, we recognized that there are some doctrinal exceptions to the finality rule that rest upon a " 'practical rather than a technical construction.' " *Id.* (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 171, 94 S.Ct. 2140, 2149, 40 L.Ed.2d 732 (1974)). We characterized the finality problem in *Koke* as resulting from the semantics of the district court's dismissal orders, but we applied an analysis that sought to recognize the underlying *effect* of the orders, and not merely their language *per se.* We adopt the same approach here.

■ The dismissal order implicated here contains language which, if considered in isolation and construed literally, might be understood to impose conditions precedent

---

**5.** Conditional terms in the order contemplated the filing of suit by appellants in a foreign forum, and submission to such jurisdiction by appellees, within ninety days of dismissal.

**6.** As we noted in *Koke,* this Court has encouraged the use of conditional dismissals in maritime cases, even though we have recognized that the "potential problem regarding appealability is at least not obvious." 730 F.2d at 215 n. 5.

**7.** We observed in *Koke* that the final judgment rule was the " 'dominant rule of federal appellate practice.' *In re 1975–2 Grand Jury Investigation of Associated Milk Producers, Inc.*, 566 F.2d 1293, 1297 (5th Cir.), *cert. denied sub nom., Associated Milk Producers, Inc. v. United States,* 437 U.S. 905, 98 S.Ct. 3092, 57 L.Ed.2d 1135 (1978)." 730 F.2d at 215.

upon the order's finality.[8] But the order recites, "[T]his action *is hereby* Dismissed" and "[I]f Defendants [appellees] should fail to promptly meet the foregoing conditions Plaintiffs may reopen this action." 577 F.Supp. at 477 (emphasis added). We think that, notwithstanding the other conditional language in the order, this statement indicates the district court's intention to have presently dismissed the case on *forum non conveniens* grounds, and merely to have held open the possibility that, should appellees have failed subsequently to submit to the jurisdiction of a foreign forum, appellants might refile their complaints in the district court.

The order of dismissal here, regardless of the semantics of its contents, does not purport to retain any even vestigial jurisdiction over the alleged causes of action: The order does not stay the actions pending fulfillment of its conditions; it does not provide for the court to reexamine at any future date the merits of the issues it had considered; nor does it contemplate the entry of any further orders regarding the merits of any such determinations, or provide for automatic reinstatement of the suit upon the failure of the appellees to conform to its conditions. *See Koke,* 730 F.2d at 218. Hence, as in *Koke,* the conditions imposed in the district court's order of dismissal act in practical manner as conditions *subsequent* to the dismissal, not as conditions precedent. *Id.* at 216–17.

We noted in *Koke* that, "[i]n the event the conditions are not fulfilled and suit is refiled, the [district] court will have to consider the merits of the case under the foreign law it has previously determined as

applicable. Further, the court has no jurisdiction to simply *reopen* the case on any aspect; it has dismissed the actions." *Id.* at 216 n. 10 (emphasis in original). This conclusion is apt here also, despite the district court's use of the word "reopen." This wording does not purport to retain in the court the power *sua sponte* to reopen or otherwise reinstate the proceedings. Rather, any ability to bring this action again in a court of the United States lies expressly *with the appellants.* This disposition clearly has the practical effect of a dismissal without prejudice. *Koke,* 730 F.2d at 216. We conclude, therefore, that the order complained of is final for the purposes of 28 U.S.C. § 1291, and that it is, consequently, appealable.

■ Although we hold this particular order appealable, we take occasion to express our strong opinion that such orders should be more precisely phrased so as to clearly indicate whether they are intended to bring about a presently effective dismissal. Where an order of dismissal is meant to be *presently effective,* and to contain only conditions subsequent, the language of the order should expressly and clearly so indicate.[9] Where, however, the court intends the dismissal order to become effective only later, upon satisfaction of articulated conditions meant to operate as true conditions *precedent,* the language of the order can easily be so drafted. We do not, therefore, here approve the language contained in the dismissal order in this case; we have merely concluded that to read the order otherwise than as a presently effective dismissal would be to construe it in a sense opposite to what the district court appar-

---

**8.** The district court "imposed" conditions substantially similar to, if more detailed and comprehensive than, those in question in *Koke.* Defendants were to: Submit to service of process in an appropriate foreign forum in which plaintiffs filed suit within ninety days, and, if jurisdiction were ultimately declined there, submit to process in a second appropriate foreign forum in which plaintiffs filed suit within ninety days thereafter; waive any limitations defense that matured during the pendency of the suit in the United States court; agree to make available in the foreign forum all witnesses within defendants' control, or to make them reasonably

available for deposition; and agree to satisfy any final decision rendered by the appropriate foreign court or agency. 577 F.Supp. at 477.

**9.** In such case, the imposition of conditions subsequent is nothing more than an announcement to the parties of the conditions under which plaintiffs' decision to refile the suit would be favorably received by the court that had determined not to hear the action, because of a *subsequent* practical failure of the dismissal to invest the suit in a more appropriate forum.

ently intended to accomplish. Finality is simply too important a concept in our appellate jurisprudence to be compromised by ambiguous language.

## TIMELINESS

Appellants' notice of appeal was filed one day beyond the thirty-day period for appeal following entry of an order of judgment. Fed.R.App.P. 4(a)(1). Appellees allege that, notwithstanding the district court's approval of appellants' motion for an extension of time in which to file notice of appeal, *see* Fed.R.App.P. 4(a)(5), appellants' appeal is untimely. In support of this proposition, appellees cite our recent holdings in *Wilson v. The Atwood Group*, 702 F.2d 77 (5th Cir.1983), *aff'd on reh'g*, 725 F.2d 255 (5th Cir.1984), and *Alamo Chemical Transportation Co. v. M/V OVERSEAS VALDEZ*, 726 F.2d 1073 (5th Cir. 1984). Appellees assert that, under these cases, late filing of an appeal is unexcused by reliance on the failure of the district court to timely provide them with notice of entry of judgment.

■ Appellees misread the clear holding of *The Atwood Group*. In that case, which involved a Fed.R.Civ.P. 60(b) request for relief from judgment on grounds of excusable neglect, we held that reliance on the district court clerk to provide notice of appeal would not justify the granting of relief on grounds of excusable neglect under Rule 60(b). But this is not a Rule 60(b) case. Rule 77(d), Fed.R.Civ.P., expressly provides that "[l]ack of notice of the entry by the clerk [of an order or judgment] does not affect the time to appeal or relieve or authorize the court to relieve a party for failure to appeal within the time allowed, *except as permitted in Rule 4(a) of the Federal Rules of Appellate Procedure.*" (Emphasis added.) It is clear that the district court has the authority under Fed.R.App.P. 4(a)(5) to allow, in its sound discretion, an extension of time in which to file notice of appeal, given a showing of excusable neglect or good cause, in a motion timely filed under the terms of this rule.[10]

■ We review such determinations by the district court on an abuse of discretion standard. The motion for extension of time was timely filed within the thirty-day period following the expiration of the normal time to file notice of appeal. *See* Fed. R.App.P. 4(a)(5). On the basis of the record before us, we are unable to find any abuse of the district court's discretion in granting the motion. The request for extension of time to file notice of appeal in *The Atwood Group* had not been timely filed. 725 F.2d at 256. Nor did appellants there make any intervening attempts to ascertain the status of the case—unlike appellants here, who did not rely solely on the clerk of court to notify them of the entry of judgment. The situation in *Alamo Chemical* was nearly identical to that in *The Atwood Group*. Those cases are thus inapposite. Appellees' motion to dismiss the appeal as untimely is denied.

## STANDARD OF REVIEW

■ In a recent case, this Court enunciated the standard of review and the analysis appropriate to *forum non conveniens* dismissals:

"Before dismissing a case for *forum non conveniens*, a court must first determine whether American or foreign law governs the claim. *Bailey v. Dolphin International, Inc.*, 697 F.2d 1268, 1274 (5th Cir.1983). This Court has held that, if American law applies, a federal court should retain jurisdiction. *Fisher v. Agios Nicolaos V*, 628 F.2d 308, 315 (5th Cir.1980), *cert. denied sub nom. Valmas Brothers Shipping, S.A. v. Fisher*, 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981). *But see Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 260, 102

---

10. Rule 4(a)(5), Fed.R.App.P., provides:

"The district court, upon a showing of excusable neglect or good cause, may extend the time for filing a notice of appeal upon motion filed not later than 30 days after the expiration of the time prescribed by this Rule 4(a).... No such extension shall exceed 30 days past such prescribed time or 10 days from the date of entry of the order granting the motion, whichever occurs later."

S.Ct. 252, 268, 70 L.Ed.2d 419 (1981). If foreign law applies, however, the court may dismiss if there is a more convenient forum available. *De Oliveira v. Delta Marine Drilling Co.*, 707 F.2d 843, 845 (5th Cir.1983). While the choice of law is subject to our *de novo* review, the court's dismissal for *forum non conveniens* will be disturbed 'only if its action constitutes a clear abuse of discretion.' *Bailey*, 697 F.2d at 1274." *Koke*, 730 F.2d at 218.

*See also Nicol v. Gulf Fleet Supply Vessels*, 743 F.2d 289, 292–93 (5th Cir.1984) (quoting *Koke*). The district court, following this approach, first determined that United States law did not apply to the instant suit. Accordingly, we turn first to a review of its determination of the proper choice of law.

## CHOICE OF LAW

■ The choice of law analysis requires consideration of the factors enunciated by the Supreme Court in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), *Romero v. International Terminal Operating Company*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), and *Hellenic Lines, Inc. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). These factors include: (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the plaintiffs; (4) the allegiance of the shipowner; (5) the place of contract; (6) the relative inaccessibility of the foreign forum; (7) the law of the forum, *Lauritzen v. Larsen*, 345 U.S.

at 583–92, 73 S.Ct. at 928–33; *Rhoditis*, 398 U.S. at 308, 90 S.Ct. at 1733; and (8) the relevant base of operations, *Rhoditis*, 398 U.S. at 308, 309, 90 S.Ct. at 1733, 1734.

■ **A. The Jones Act and Maritime Claims.** The district court gave primary weight to the place of contract, the locus of the accident and the relevant base of operations, and inaccessibility of the United States as a forum in its consideration of appellants' injury and death claims. All these considerations clearly point away from the United States as the proper forum, and toward either the Philippines or Saudi Arabia as the countries with greater and more immediate interest in the maintenance of this action. Of lesser import, the district court felt, were the allegiance of the rig owner and the law of the flag. The relative advantageousness of the forum was found to be of "minimal importance." 577 F.Supp. at 465.

Appellants argue that the district court improperly weighted the various factors. They assert especially that the court failed to attach sufficient importance to the "law of the flag" and "owner's allegiance" factors. In prior cases where the former has been given relatively great weight in the choice of law calculus, the incident complained of has usually occurred on the high seas and has involved a vessel engaged in traditional shipping activity.[11] Under such circumstances, considerations of comity and of the sovereignty of a sister nation under whose flag the vessel sails dictate that those events on board that "affected only the vessel, or those belonging to her,

---

**11.** In *Lauritzen v. Larsen*, Justice Jackson noted that in the usual shipping context, the place of contracting was "fortuitous":

"A seaman takes his employment, like his fun, where he finds it; a ship takes on crew in any port where it needs them. The practical effect of making the *lex loci contractus* govern all tort claims during the service would be to subject a ship to a multitude of systems of law, to put some of the crew in a more advantageous position than others, and not unlikely in the long run to diminish hirings in ports of countries that take best care of their seamen." 345 U.S. at 588, 73 S.Ct. at 931.

He noted that the contract involved in the case specified that Danish law should apply, and

noted that the tendency of the law, where contract law was considered, was to honor such a specified intent of the parties—so long as it was not specified in an attempt to "avoid applicable law, for example, so as to apply foreign law to an American ship." *Id.* at 589, 73 S.Ct. at 932. But *Lauritzen v. Larsen* involved a ship engaged in international shipping, sailing international waters under the Danish flag, unlike the stationary rig involved here and distinguished in *Chiazor v. Transworld Drilling Co.*, 648 F.2d 1015, 1019 (5th Cir.1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982), and its progeny.

... be left by the local government to be dealt with by the authorities of the nation to which the vessel belonged as the laws of that nation, or the interests of its commerce should require." *Lauritzen v. Larsen,* 345 U.S. at 585–86, 73 S.Ct. at 929–30 (quoting *Cunard S.S. Co. v. Mellon,* 262 U.S. 100, 123, 43 S.Ct. 504, 507, 67 L.Ed. 894 (1923)). But the R/V RON TAPPMEYER was not sailing through international waters; nor was her location at the time of the complained of accident merely fortuitous, far from any interested or otherwise appropriate forum. The rig was semi-stationary and in foreign waters. Traditional interest in the "law of the flag" and vessel ownership are thus diminished in this case:

> "[U]nlike traditional maritime vessels, the operations of offshore drilling rigs tend to be conducted in a more permanent fashion off the coast of a foreign country, and the 'fortuitous circumstances' respecting the place of wrongful act and the place of contract that were given lesser significance in connection with traditional maritime vessels in *Lauritzen* are not present in the offshore drilling rig context." *Bailey,* 697 F.2d at 1277.

*See Chiazor v. Transworld Drilling Co.,* 648 F.2d 1015, 1019 (5th Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982); *Zekic v. Reading & Bates Drilling Co.,* 536 F.Supp. 23, 25 (E.D.La.1981), *aff'd,* 680 F.2d 1107 (5th Cir. 1982). "[S]uch factors as place of wrongful act, allegiance or domicile of the injured, and place of contract, which may be less substantial in the shipping context, tend to take on added significance under [such] circumstances." *Chiazor,* 648 F.2d at 1019; *see also Nicol,* 743 F.2d at 297; *Bailey,* 697 F.2d at 1275.

The employment contracts at issue here were all executed in the Philippines. They call for all disputes arising from breach of those contracts, or for settlements or compensation for injury or death, to be decided by the appropriate Philippine agency, under Philippine law, and for return of the employee to the Philippines. All appellants are citizens and domiciliaries of the Philippines. None are or were United States residents, and they have had no contact with the United States beyond that afforded merely by virtue of the ownership of the rig and the allegiance of the operating company. There were no appropriate operational contacts between the rig itself and the United States. The R/V RON TAPPMEYER was manufactured in Singapore in 1978, and had been operated exclusively in work off the coasts of the Philippines or Saudi Arabia since that time. The Saudi government regulates the drilling industry in its home territorial waters, and the day-to-day operations of the rig were supervised by RBSAB from its office in Saudi Arabia. Under all these circumstances, it appears highly unlikely that any of appellants could have expected that a United States court, or United States law, would resolve disputes under their contracts or determine compensation for injuries while employed thereunder on this semi-stationary drilling rig.

It seems to us evident on these facts that the relative interests of either the Philippines or Saudi Arabia, respectively, protecting their nationals and regulating oil drilling in their territorial waters, are substantially greater than the attenuated interests of the United States. Under the circumstances, the "owner's allegiance" and "law of the flag" factors are not decisive, and the district court correctly held that United States law does not govern the personal injury and wrongful death claims. *Koke* at 218–20.

**B. The Wage Claims.** The district court made express findings that the United States penal wage statute, 46 U.S.C. § 596 [12], was not applicable to appellants'

---

**12.** Section 596, 46 U.S.C., provided:

"The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the

claims for unpaid wages.[13] The court noted that in all cases relied upon by appellants, where foreign seamen had recovered under the statute, those seamen had been discharged at a United States port. *E.g., Abraham v. Universal Glow, Inc.,* 681 F.2d 451 (5th Cir.1982); *Grevas v. M/V OLYMPIC PEGASUS,* 557 F.2d 65 (4th Cir.), *cert. denied,* 434 U.S. 969, 98 S.Ct. 515, 54 L.Ed.2d 456 (1977). Foreign seamen generally cannot invoke the protection of section 596. *See Transportes Maritimos do Estado v. Almeido,* 5 F.2d 151 (2d Cir.1925); *Cubeiro v. Sun Seaway Enterprises, Inc.,* 539 F.Supp. 1175 (S.D.1982); *but cf. Ventiadis v. C.J. Thibodeaux & Co.,* 295 F.Supp. 135 (S.D.Tex.1968). *See also* 46 U.S.C. §§ 10301, 10313(b) (1983); *cf.* 46 U.S.C. § 10313(i) (1983). The district court identified the interests that Congress sought to protect when it enacted the section—in part to prevent a seaman from being left destitute at a foreign port far from home—and found those interests not to be present here, where discharged domiciliaries of the Philippines had been returned home pursuant to the terms of their employment contracts.

 The same choice of law factors which determine the law applicable to Jones Act or general maritime claims apply also in the determination of whether section 596 is applicable. *See Romero v. International Terminal Operating Co.,* 358 U.S. at 382, 79 S.Ct. at 485. The absence of contacts with the United States is important as a consideration in this respect. No maritime articles were signed by any of the appellants. Affidavits filed by them indicated that all their wage claims "derive either directly from Philippine law and the governing employment contracts or from the failure of [RBSAB] to pay claimed wages pursuant to the contracts ...." 577 F.Supp. at 472. The district court found there was a need to forbear from application of section 596, as a matter of comity with the Philippines, and in the interest of

cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court; but this section shall not apply to masters or owners of any vessel the seamen of which are entitled to share in the profits of the cruise or voyage. This section shall not apply to fishing or whaling vessels or yachts."
This section has been repealed. Pub.L. 98–89, § 4(b), 97 Stat. 600–604 (Aug. 26, 1983). The relevant subject matter is now covered by 46 U.S.C. §§ 10301(b) and 10313(f)–(h) (foreign and intercoastal voyages); §§ 10501(b) and 10504(b)–(d) (coastwise voyages). Section 10301 provides, *inter alia,* applicability only to a vessel of the United States "on a voyage between a port in the United States and a port in a foreign country," excluding Canada, Mexico, and the West Indies, and, unless otherwise provided in the chapter, excludes foreign vessels. Section 10313(b) provides that, upon loss or wreck of the vessel, before the completion of the contract, a seaman is entitled only to wages "for the period of time actually served." Section 10313(f) preserves the requirements of payment within twenty-four hours of cargo offloading, or within four days after the seaman is discharged, whichever is earlier, with at least one-third to be paid at the time of discharge if there is to be any delay in total payment. Section 10313(g) provides that if the delay is without sufficient cause, the master or owner must pay two days' wages per day of delay beyond that allowed in subsection (f). Subsection 10313(i) extends the terms of these subsections to a foreign vessel "when in a harbor of the United States," and provides expressly that "[t]he courts are available to the seaman for the enforcement of this section."

13. Appellants were discharged and transported to the Philippines following the accident. Their employment contracts recite that:
"The term of employment will be one (1) year from the effective date of this contract and subject to the availability of work in which case this contract may be terminated prior to the period stipulated above.... [I]n the event the COMPANY terminates the contract prior to the one (1) year period other than for cause, repatriation of the EMPLOYEE to the point of hire shall be borned [*sic*] by the COMPANY as provided by Article VII ... [Article VII provides that at company expense the employee "shall be returned by the first available and practicable means of transportation"]."

preserving the integrity of the international maritime legal system. *Id.* at 471. Finally, the district court concluded that, even were this section applicable after a choice of law analysis, by its own terms it did not apply to the instant action, because it "does not apply to semi-stationary vessels, such as dredges, or to those operating in close proximity to one port, *i.e.*, those in the 'coastwise trade.'" *Id.* at 472 (citations omitted); *see* 46 U.S.C. § 544; *but cf.* 46 U.S.C. § 10504(e) (1983).

We find no legal error with this analysis, or with the conclusions reached by the district court in this respect.

▇▇▇ The district court also found that appellants' wage claims were not brought in good faith. Appellant Chu was not employed by any of the named defendants. It was undisputed that the other appellants were in fact paid the earned wages called for by their employment contracts. Their claims are for unearned hours' wages and are based on the uncompleted term of those contracts following discharge, which are not subject to the penalty provisions of section 596. *See, e.g., Griffin v. Oceanic Contractors, Inc.,* 664 F.2d 36 (5th Cir. 1981), *rev'd on other grounds,* 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982); *Isthmian Lines, Inc. v. Haire,* 334 F.2d 521, 523 (5th Cir.1964). Several of the appellants have already settled their claims in the Philippines, and have signed releases of all wage claims they may have had prior to the reaching of these settlements. The validity of these settlements and releases was not contested.

Some of appellants' allegations relating to their entitlement to wage payments derive entirely from Philippine law, which allegedly requires additional pay for hours worked beyond eight per day, and for hours worked on Sundays or holidays.[14]

This requirement is not consistent with the terms of the contracts themselves, the validity of which no appellant here contests. Certainly, this claim is founded not at all upon United States law.

Finally, the district court noted that the section 596 wage claims were likely unfounded, because there was evidence that any unpaid wages had been withheld with sufficient cause to overcome a section 596 claim:

> "Defendants [appellees] did not act in an arbitrary, unjustified, or unreasonable manner in maintaining that because general American maritime law was inapplicable to their operations in Saudi Arabia that another part of maritime law, section 596, was similarly inapplicable. Defendants acted reasonably by paying their workers the full amounts due under their employment contracts, and transferring resolution of all attacks upon the validity of the contracts to a court of law."[15] 577 F.Supp. at 475.

The district court concluded that appellants individually and as a group had failed to sustain their burden of proof to show that their Philippine law-based wage claims were made in good faith. *See, e.g., Mihalinos v. Liberian S.S. TRIKALA,* 342 F.Supp. 1237, 1243 (S.D.Cal.1972); *cf.* Fed. R.Civ.P. 44.1.

For all these reasons, the district court concluded that appellants' wage claims had not been made in good faith, and that they were, in any event, not likely to succeed on the merits even were section 596 found to be applicable. This determination, coupled with the choice of law analysis applicable to appellants' Jones Act and maritime claims, and the clear sense that section 596 was neither applicable by its own terms nor intended to apply to such claims, led the

---

**14.** The district court noted that appellants had made no *prima facie* showing that Philippine law imposed such requirements. *See Mihalinos v. Liberian S.S. TRIKALA,* 342 F.Supp. 1237, 1243 (S.D.Cal.1972).

**15.** We note that section 596 required payment of wages "within two days after the termination of the agreement under which he was shipped,

or at the time such seaman is discharged, whichever first happens." None of the appellants challenges the validity of the underlying contracts. The district court noted that "the applicability of section 596, and the invalidity of the employment agreements at bar are both doubtful propositions." 577 F.Supp. at 475–76.

court to conclude that United States law was not applicable to appellants' wage claims. We agree.

Having determined that the district court was correct in its conclusion that United States law was not applicable to any of appellants' claims, we turn to the *forum non conveniens* analysis that led the court to dismiss the case.

## THE *FORUM NON CONVENIENS* DISMISSAL

The district court noted that, although a plaintiff's choice of forum is entitled to "studied consideration," 577 F.Supp. at 477, the weight to be accorded that choice is diminished where the plaintiff has chosen a foreign forum in which to litigate his claims. "In this case the presumption favoring Plaintiffs' choice of forum has been overcome by overwhelming countervailing considerations." *Id.*

██ The district court found that, "without question," the United States was an "inconvenient forum." *Id.* at 476. This conclusion is supported by consideration of a variety of factors. The domicile of appellants in the Philippines is foremost among these. As the district court noted, it would be highly inconvenient for the appellants here to attend trial in the United States, or for their counsel to prepare a case properly without their presence here. The court found that the nearly three-month period required to obtain affidavits from appellants in the Philippines at one point during the proceedings below was indicative of this difficulty. Potential witnesses—many, if not all the workers were apparently Philippine nationals—undoubtedly reside closer to the Philippines (or to Saudi Arabia) than to this country, a fact that would also add to the difficulty and inconvenience of the maintenance of the suit here. The subpoena power to compel testimony of third-party witnesses would undoubtedly be more easily applied in a different forum. The court's conclusion that all parties would save time and money if the case were tried elsewhere is also sound. As the court recognized, all events relevant to the suit occurred in one or the other of those foreign forums.

There has been no showing here that any of appellants will be precluded from bringing suit in either the Philippines or Saudi Arabia to obtain just compensation. *Cf. Liaw Su Teng v. Skaarup Shipping Corp.*, 743 F.2d 1140, 1147 (5th Cir.1984). The evidence indicates that just the opposite is true: Several appellants have already reached settlement agreements with the appellees in the Philippines, and other appellants have filed similar lawsuits there.[16]

The district court also concluded that, where United States law had been found to be inapplicable, it would be a complex and difficult task for a United States court to apply the law of another nation. While this consideration alone is not sufficient ground to refuse to entertain a proper suit, the district court, citing the greatly overloaded docket of the district, noted that interests of conserving judicial resources militated in favor of dismissal. "If a suit such as this can be heard in Houston, Texas, then truly this District will become a forum for the world." 577 F.Supp. at 476.

The district court's conclusion that there were simply no contacts with the United States that would justify the choice of this country as the forum for such a suit, and that it would be judicially and practically inconvenient to do so in any event, is, on the facts in this record, more than adequately supported. The district court's determination to dismiss on *forum non conveniens* grounds was not an abuse of its sound discretion, and we accordingly affirm the dismissal.

---

16. Appellants Malicsi, Dimaflex, Manarang, Prado, Perez, and the wife of decedent Bautista have already settled their claims with appellees, including execution of a release to all claims against appellees, prior to instituting this suit.

Appellants Sanchez and Cuevas have begun lawsuits in the Philippines, seeking damages for injury, breach of contract, and payment of wages and medical expenses.

REFUSAL TO TRANSFER THE CASE

Appellants assert that the district court should have transferred the case to the Louisiana federal court hearing parallel litigation, to enable that court, in which discovery had already begun, to more properly determine the merits of the appellees' *forum non conveniens* motion to dismiss. As support for this proposition, appellants cite our recent decision in *Liaw Su Teng v. Skaarup Shipping Corp.*, 743 F.2d at 1140. Appellants argue that an inconsistent result may obtain, where that parallel litigation may be allowed to be maintained in the United States, while their virtually identical suit is dismissed. We disagree with this contention.

In *Liaw Su Teng*, thirty-two crewmembers of a vessel involved in a collision on the high seas died. Each was a foreign national. The vessels involved in the collision flew flags of different nations, but members of one crew sought redress from the owners of both vessels in a United States court. The defendant employer-owner moved for transfer to another federal court. The district court granted the motion, but determined that personal jurisdiction was lacking over the other (nonemployer) owner, and dismissed the claims against it for reasons of *forum non conveniens*. We said in that case that

"[a]bsent compelling reasons, such a suit obviously ought not be divided into separate suits against the owner of each vessel with each case then to be tried separately in the forums of different nations, for that sort of bifurcation creates not only the necessity of two separate trials to determine responsibility for a single event, but also the possibility of inconsistent results." *Id.* at 1142.

The district court's refusal to transfer the dismissed claims in that case to the other federal district court for a decision on the *forum non conveniens* motion was predicated on grounds that the dismissing court was not convinced that the alternative federal court was one in which the actions might originally have been brought. *See* 28 U.S.C. § 1404(a); *see also Hoffman v. Blaski*, 363 U.S. 335, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960); *Liaw Su Teng*, 743 F.2d at 1145 n. 6, 1147–48; *cf.* 28 U.S.C. § 1406(c). But we held that the district court had applied an erroneous analysis in reaching in the first instance its decision that United States law did not apply. We noted that the approach applied by the district court

"confuses the analysis applicable to a Jones Act unseaworthiness claim by a seaman against the vessel aboard which he was employed with that [analysis] applicable to a claim by a person injured on the high seas against a vessel with which he had no employment connection. The applicability of the Jones Act and the almost invariably related unseaworthiness claim against the owner of the employer vessel turns not only on the crewmember's connection with the vessel but on other factors that are essential to determining that these American law bases for liability may exist. That decision must be based on the *Lauritzen–Rhoditis* factors, which determine whether either United States or foreign law is applicable.

"A different preliminary analysis for determining the applicable body of law is necessary with respect to a seaman's claim against a third-party vessel for injuries sustained as a result of an alleged tort on the high seas. That sort of claim must be decided by principles of United States law, interpreting and applying the communis juris, the common law of the seas." *Liaw Su Teng*, 743 F.2d at 1144 (footnote and citation omitted).

In the case of "a tort allegedly committed by a third person on the high seas," we said that the controlling law was the law of the forum as that forum interpreted the *communis juris*. *Id.* at 1145. We particularly distinguished that character of suit from suits "of seamen against those who stand in the locus of their employer" or "of a foreign claimant for injuries sustained in foreign coastal waters," on which "the *Lauritzen-Rhoditis* factors focus." *Id.* For the third-party high seas tort case, we

framed the question as being whether the United States court should *exercise* its jurisdiction. *Id.* at 1145, 1146. The defendant employer had already submitted to personal jurisdiction in the Southern District of New York. We characterized the remaining question before the district court as "whether it should decline to exercise the jurisdiction thus established." *Id.* at 1145. Consequently, according to the Supreme Court's holding in *Jackson v. Jensen (The Belgenland)*, 114 U.S. 355, 5 S.Ct. 860, 29 L.Ed. 152 (1885), we found that a federal court should retain jurisdiction of such a case, unless to do so would result in injustice. 743 F.2d at 1146 (citing 114 U.S. at 367, 5 S.Ct. at 865).

"Retention of jurisdiction in suits involving the communis juris does not automatically follow from the applicability of American law." 743 F.2d at 1146. We noted that in such cases, federal courts might decline jurisdiction in order to prevent misuse of the plaintiff's ability to seek a favorable forum. But, where the choice of forum factor was not being abused, a court should determine whether jurisdiction should be retained by considering a variety of factors, including the availability of an adequate alternative forum. If such a forum were available, the court should conduct the balancing test announced in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). We concluded that, considering these factors, unless the balance strongly favored the defendant, a plaintiff's choice of forum should be honored. 743 F.2d at 1146.

We held finally that dismissal of the case was improper. We noted that the appropriate factors weighed against dismissal, and further, unlike the case at bar, that there had been no showing that another adequate forum was even available. *Id.* at 1147. We noted that it was rarely the case that the severance of so integrated a case, with one claim tried in one forum and another identical claim tried halfway across the world in a separate forum, would be the most appropriate resolution. "Our duty is to ignore the gamesmanship of the litigants and to seek the most just result permitted by applicable law." *Id.* at 1149. A factor that weighed heavily in our determination that such severance made no sense in *Liaw Su Teng* was the recognition that "both parties have, by their procedural maneuvers, effectively consented to jurisdiction and venue in the transferee forum." *Id.* at 1150.

Thus, the holding in *Liaw Su Teng* is factually and legally inapt to the case at bar. This is not a third-party high seas tort case; it is, rather, the suit of foreign seamen against their employer for injuries sustained in foreign coastal waters, the very kind of case that *Liaw Su Teng* distinguished. There was no necessity for the district court in this case to transfer the suit to the Louisiana federal court for a disposition of the *forum non conveniens* dismissal motion, because the same considerations would necessarily still weigh heavily in favor of dismissal. As the district court recognized, there was simply no reason to burden the other federal court with a question that was so manifestly one-sided. Nor, as appellants assert, is the ongoing presence of a "parallel" suit in the Louisiana federal court a compelling consideration to the contrary. The plaintiff in that suit is an American citizen; in certain circumstances, distinctions of nationality and residence may justify differences in treatment between plaintiffs. *See, e.g., Piper Aircraft Co. v. Reyno*, 454 U.S. at 255–56, 102 S.Ct. at 265–66; *Vaz Borralho v. Keydril Co.*, 696 F.2d 379, 390, *reh'g denied*, 710 F.2d 207 (5th Cir.1983). And, the two actions here are not as meaningfully interrelated as in the two-vessel high-seas collision, third-party tort suits presented in *Liaw Su Teng*.

We thus perceive there to have been no necessity for the district court to have transferred the case to the Eastern District of Louisiana for consideration of a motion of which it so capably disposed.

## CONCLUSION

Appellants, all Philippine nationals and domiciliaries having no prior contact with

the United States, were injured aboard a semi-stationary drilling rig off the coast of Saudi Arabia. By the terms of their employment contracts, Philippine law was applicable. We find American law to be inapplicable under a choice of law analysis. The same factors that dictate the choice of foreign law, and additional *Gilbert* considerations, militate heavily in favor of dismissal on *forum non conveniens* grounds. The United States is simply not the appropriate forum for a suit where there are involved no direct interests of the United States as a forum, nor sufficient contacts to justify the maintenance of a suit by nonresident foreign nationals in this country.

For all these reasons, we affirm the district court's dismissal of the suit on *forum non conveniens* grounds.

AFFIRMED.